412 A.2d 892

CENTRAL DAUPHIN SCHOOL DISTRICT

v.

AMERICAN CASUALTY COMPANY, Appellant.

Superior Court of Pennsylvania.

Argued March 12, 1979.

Filed Oct. 19, 1979.

220

Leo E. Gribben, Jr., York, for appellant.

David E. Lehman, Harrisburg, for appellee.

Before CERCONE, P. J., and WIEAND and HOFFMAN, JJ.

WIEAND, Judge:

The Board of Education of the Central Dauphin School District adopted a resolution which imposed a tax on the occupations of all persons eighteen years of age or older who resided in the district. On March 14, 1975, the Court of Common Pleas of Dauphin County held the resolution invalid as to persons who were not engaged in a gainful occupa-

tion, e. g., homemakers and retirees.[1] As a result of this ruling, the school district refunded $529,000 in tax monies collected from those exempt taxpayers who submitted written claims in accordance with the Act of May 21, 1943, P.L. 349, No. 162 § 1, as amended, 72 P.S. § 5566b. The school district promptly filed a claim with its insurer, American Casualty Company, requesting indemnification for the monies it was compelled to pay exempt taxpayers. The insurance company concluded that the refund of illegally collected taxes was not a "loss" as contemplated by the policy and denied the claim. It conceded, however, that the school directors' error in adopting a defective tax resolution was a "wrongful act" as defined by the policy and agreed to reimburse the school district for its legal expenses in defense of the equity suit. The present action in assumpsit was brought to recover all monies refunded by the district to its taxpayers. The trial court initially found in favor of the insurer. The school district filed exceptions, however, and the trial court, upon reconsideration, reversed its prior verdict and entered judgment in favor of the school district. The insurance company appealed.

Appellee's initial policy, entitled "Board of Education Liability Including School District Reimbursement Policy", had been amended by a Liberalization Endorsement. Prior to amendment, the policy had provided protection for the school directors and employees of the district[2] for loss occasioned by their wrongful acts. The School District had been covered only to the extent it was required to indemnify an Assured for loss resulting from an Assured's wrongful act. It could not recover in its own right for claims made against it for loss caused by an Assured's actions. The Liberalization Endorsement, however, extended the policy's coverage to the School District. While appropriately amend-

1. *Peifer v. Central Dauphin School District*, 70 Pa.D. & C.2d 35 (1975).

2. The policy defined Assureds as: "All persons who were, now are or shall be employed by the School District and shall also include student teachers and all elected or appointed members of the Board of Education, Trustees or School Directors of the School District."

ing the provisions of the policy, the endorsement added a new insuring clause by which the company agreed:

"With the School District that if during the policy period any claim or claims are made against it as a result of any Wrongful Act occurring during the policy period, the Insurer will pay on behalf of, in accordance with the terms of this policy, all loss which the School District shall become legally obligated to pay."

Appellee contends that by this language the insurer agreed to indemnify it against sums which it was required to pay out in response to tax refund claims. Appellant, on the other hand, argues that it cannot be liable thereon because the insured did not commit a "wrongful act", and appellee did not sustain a "loss".

Because an insurance policy is a contract, we must determine the intent of the parties as manifested by the language of the written agreement. *Treasure Craft Jewelers, Inc. v. Jefferson Insurance Co. of N. Y.*, 583 F.2d 650 (3rd Cir. 1978); *Mohn v. American Casualty Co.*, 458 Pa. 576, 326 A.2d 346 (1974); *Adelman v. State Farm Mutual Automobile Insurance Co.*, 255 Pa.Super. 116, 386 A.2d 535 (1978). The policy must be read in its entirety and, where the language is clear and unambiguous, its terms are to be given their plain and ordinary meaning. *Pennsylvania Manufacturers' Ass'n. Insurance Co. v. Aetna Casualty & Surety Insurance Co.*, 426 Pa. 453, 233 A.2d 548 (1967); *Blocker v. Aetna Casualty & Surety Company*, 232 Pa.Super. 111, 332 A.2d 476 (1975). Insurance contracts are considered adhesion contracts, and genuine ambiguities, if any, must be resolved in favor of the insured and against the insurer.[3] *Treasure Craft Jewelers, Inc. v. Jefferson Insurance Co. of N.Y.*, supra; *Mohn v. American Casualty Co.*, supra.

**3.** Concerned with the inferior bargaining position of the insured, the Pennsylvania Supreme Court recently has criticized the traditional contractual approach to the interpretation of insurance contracts and has adopted an analysis by which the court reviews the totality of the transaction to determine the reasonable expectations of the insured as to the coverage provided by the policy. *Collister v. Nationwide Life Insurance Co.*, 479 Pa. 579, 388 A.2d 1346 (1978); *Brakemen v. Potomac Insurance Co.*, 472 Pa. 66, 371 A.2d 193 (1977).

■ In the instant case, the terms "wrongful act" and "loss" are defined by the definitional section of the policy in terms which are clear and free from ambiguity. There is no need to rely on definitions adopted by courts in other jurisdictions, as appellant would have us do. To interpret the policy by adopting such definitions would be to rewrite the parties' agreement. This we may not do. See: *Adelman v. State Farm Mutual Automobile Insurance Co.*, supra.

■ A "wrongful act" is defined by the policy as follows: "Wrongful Act shall mean any actual or alleged errors or misstatement or misleading statement or act or omission or neglect or breach of duty by the Assureds in the discharge of their duties, individually or collectively, or any matter claimed against them solely by reason of their having been Assureds during this policy period."

This definition is very broad. It includes "any actual or alleged . . . act . . . by the assureds (school directors) in the discharge of their duties individually or collectively . . . ." Thus, any act committed by the school directors which results in a claim against the district is covered. In this case, the enactment of a defective tax ordinance was an act by the school directors. It might also be construed as an actual or alleged error committed by them.[4]

■ Appellant asserts additionally that the School District is not covered because the alleged wrongful act, i. e., enactment of a defective tax resolution, was committed by the School District and not the "Assureds". In support of this argument appellant points out that the original action was brought by taxpayers against the School District and not

4. At the time the School Directors enacted the occupation tax resolution, Supreme Court decisions indicated that "occupation" used as a basis for a tax assessment, was applicable only to those engaged in a pursuit of an economic nature. See: *Crosson v. Downington Area School District*, 440 Pa. 468, 476, 270 A.2d 377, 381 (1970); *Crawford v. Southern Fulton School District*, 431 Pa. 324, 328, 246 A.2d 332, 336 (1968); *Banger's Appeal*, 109 Pa. 79, 95 (1885). Furthermore, at least one Common Pleas decision had previously held an occupation tax invalid as to retirees and homemakers. See: *Bigler v. Penn Manor School District*, 63 Lancaster L.Rev. 409 (1972).

against the individual members of the board. It seems clear, however, that the passage of the tax resolution was an act by the school directors, as well as an act of the district. The school directors, acting within the scope of their authority, proposed, drafted and enacted the tax resolution which gave rise to the tax reimbursement claims.

The policy also defines broadly the term "loss":

"*Loss shall mean any amount which the Assured or School District are [sic] legally obligated to pay,* including, but not limited to, any amounts which the School District may be required or permitted to pay as indemnity to an Assured, for a claim or claims made against an Assured for a Wrongful Act and shall include but not be limited to damages, judgments, settlements and costs, cost of investigation and defense of legal actions . . . claims or proceedings and appeals therefrom, costs of attachment or similar bonds, provided always, however, such subject of loss shall not include fines imposed by law, or matters which shall be deemed uninsurable under the law pursuant to which this policy shall be construed." (Emphasis added)

Appellee school district, by virtue of the equity decree invalidating portions of the tax resolution, was obligated by law to refund tax money upon written demand by exempt taxpayers. Appellant argues that appellee did not suffer a loss because the erroneously collected taxes never actually became a part of the school district's funds. An illegal resolution, appellant asserts, is void from the date of enactment and confers no rights, affords no protection and justifies no acts performed under it. Although an unconstitutional statute, as a general rule, is deemed void ab initio, there are many exceptions. See: *Box Office Pictures, Inc. v. Board of Finance and Revenue,* 402 Pa. 511, 166 A.2d 656 (1961). One such exception is a taxing statute enacted by a school district. See: *Phipps v. School District of Pittsburgh,* 111 F.2d 393 (3rd Cir. 1940). It is for this reason that taxes collected by the district became a part of its assets upon receipt and remained so until a claim for a refund was made

by an exempt taxpayer.[5]  Moreover, and in any event, it is unnecessary that we determine when or if tax money collected became a part of a school district's assets.  It is clear that the school district was legally obligated to pay the amounts demanded by exempt taxpayers;  and, under the terms of the policy, such payment was defined as a loss.

Appellant argues that the definition of "loss" limited the amount appellee school district was entitled to recover to that amount which appellee paid as indemnity to the school directors for claims made against them for a wrongful act. If this had been correct under the policy without the Liberalization Endorsement, it clearly was not correct after the policy had been amended by the endorsement.  The policy thereafter defined loss as "any amount which the Assured *or the School District are [sic] legally obligated to pay. . . .*" (Emphasis supplied).  The addition of the Liberalization Endorsement manifested a clear intent to extend coverage of the policy to losses sustained by the School District.

The policy definition of "loss" excludes matters that are uninsurable under existing law.  Appellant argues that tax refunds are uninsurable by law because the Public School Code of 1949 [6] does not authorize this type of insurance.  A school district, being a creation of the legislature, has only the powers that are granted by statute specifically, or by necessary implication.  *Barth v. Philadelphia School District,* 393 Pa. 557, 563, 143 A.2d 909, 912 (1958);  *Wilson v. Philadelphia School District,* 328 Pa. 225, 231–32, 195 A. 90, 94 (1937);  *Smethport Area School District v. Bowers,* 219 Pa.Super. 269, 273, 280 A.2d 632, 635 (1971).  The Public School Code of 1949 permits, but does not require, school districts to enter into a variety of insurance contracts—group insurance including life, health, medical service, acci-

5. The Act of May 21, 1943, P.L. 349, No. 162 § 1, as amended, 72 P.S. § 5566b provides that a taxpayer, who has paid to a political subdivision taxes to which the subdivision is not legally entitled, *must make a written claim for a refund within two years of the payment of the taxes.*

6. Act of March 10, 1949, P.L. 30 No. 14, 24 P.S. § 1–101 et seq.

dent, hospitalization, travel and retirement insurance;[7] motor vehicle insurance covering the transportation of pupils[8] and the driver training program;[9] insurance on deposits of school funds;[10] public liability insurance;[11] fire insurance;[12] and insurance covering participation in athletic programs.[13] Nothing in the Code suggests that this list of permissible insurance contracts is intended to be exclusive. There is nothing in the Code that prohibits a school district from purchasing the type of insurance provided by the policy in the instant case; and appellant has offered no compelling reason to bar a school district from obtaining insurance protection from loss of revenue caused by the errors and omissions of its professional staff.

Finally, appellant contends that the insurance contract, as construed by the lower court, contravenes public policy. We are not persuaded by this argument. Contracts of insurance that protect the insured from the consequence of his or her negligent acts, errors and omissions are valid. See: 13 Couch on Insurance 2d 48:161–65 (1962). It is where the direct purpose of an insurance contract is to promote, encourage, or effect a violation of law or where the insured seeks indemnity for loss which arises from his or her own intentional, fraudulent, reckless or criminal conduct, that public policy will preclude enforcement of an insurance contract. See: 9 Couch on Insurance 2d 39:14–15 (1962). Cf. *Mineo v. Eureka Security Fire & Marine Ins. Co.*, 182 Pa.Super. 75, 125 A.2d 612 (1956). Appellant has not alleged and the record does not suggest that appellee has acted in anything but the utmost good faith in promulgating the tax

7.  24 P.S. § 5–513.

8.  24 P.S. § 13–1362.

9.  24 P.S. § 15–1519(c).

10.  24 P.S. § 6–623.

11.  24 P.S. § 7–774(b).

12.  24 P.S. § 7–774(a).

13.  24 P.S. § 5–511(f).

resolution. We do not perceive, as appellant predicts, that our interpretation of this insurance policy will have the effect of encouraging laxity or misconduct on the part of school officials.

Admittedly, this case presents a novel question of liability. Simply because a loss of revenue due to the invalidation of a tax resolution is an uncommon risk, however, does not permit us to rewrite the contract to exclude an occurrence which falls within the express terms of the contract. If such a risk is to be excluded, it must be done by removing and excluding the same from the coverage provided by the policy.

Judgment affirmed.