[J-96-2018][M.O. - Dougherty, J.]

**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

AUGUSTUS FELECCIA AND JUSTIN T. RESCH,

         Appellees

         v.

LACKAWANNA COLLEGE A/K/A LACKAWANNA JUNIOR COLLEGE, KIM A. MECCA, MARK D. DUDA, WILLIAM E. REISS, DANIEL A. LAMAGNA, KAITLIN M. COYNE AND ALEXIS D. BONISESE,

         Appellants

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

No. 75 MAP 2017

Appeal from the Order of the Superior Court at No. 385 MDA 2016 dated 2/24/17, reconsideration denied 4/26/17, reversing the judgment of the Lackawanna County Court of Common Pleas, Civil Division, at No. 12-CV-1960 entered 2/2/16 and remanding for trial

ARGUED: December 5, 2018

## CONCURRING AND DISSENTING OPINION

**CHIEF JUSTICE SAYLOR**                **DECIDED: August 20, 2019**

I join the majority opinion to the extent it reverses the Superior Court's creation of a generalized duty of care owed by Pennsylvania colleges to student athletes to have medical personnel available at all football practices. *See* Majority Opinion, *slip op.* at 14. I respectfully differ, however, with the majority's follow-on holding that, under an assumption-of-duty theory as reflected in Section 323 of the Second Restatement of Torts, Lackawanna College definitively owed a duty of care to Plaintiffs on the date in question.

As a general matter, whether a defendant owed a duty of care to another person at the relevant time is a legal issue to be decided on the underlying facts. *See, e.g., Dittman v. UPMC*, ___ Pa. ___, ___, 196 A.3d 1036, 1046 (2018); *accord Kukis v.*

*Newman*, 123 S.W.3d 636, 639 (Tex. Ct. App. 2003) ("The existence of a duty is a question of law for the court to decide based on the specific facts of the case."). Because the complaint was dismissed on a defense motion for summary judgment, the majority appropriately "consider[s] the record in the light most favorable to [Plaintiffs] as the non-moving parties[.]" Majority Opinion, *slip op.* at 19. In doing so the majority recites certain facts which remain in dispute. This alone is not problematic given that, again, the record is being viewed favorably to Plaintiffs. The difficulty arises when the majority holds, in definitive terms, that a duty existed in light of such circumstances.

For example, the majority states, "Lackawanna held out Coyne and Bonisese as athletic trainers to [Plaintiffs] and their teammates," and that these same two individuals "performed the role of athletic trainers by attending [Plaintiffs] when they were injured[.]" *Id.* Notably, Appellees expressly denied that Coyne and Bonisese held themselves out as athletic trainers or Lackawanna College held them out as such. *See* Defendants' Answer and New Matter at ¶¶40, 42, 43, 44 (averring that, at all relevant times, Coyne and Bonisese were held out by themselves and the college as first responders). Thus, I would frame the holding in more abstract terms and allow the common pleas court to determine, after resolution of any necessary factual disputes, whether Appellees' affirmative conduct created a duty under the circumstances – and if so, the scope that duty.[1]

---

[1] For example, the majority states that Appellees had a duty to "provide" athletic trainers, whereas the Superior Court indicated that the college was required to "have qualified medical personnel available" for the practice. While the difference between "providing" an athletic trainer and having medical personnel "available" may seem formal, Plaintiffs agree such personnel need not be physically present on the field if they are available for immediate consultation via telecommunications. *See* Brief for Appellees at 27-28, 31-33. The difference may be material because, in their responsive pleading, Appellees deny Plaintiffs' allegations that such personnel were unavailable. They have also noted that the consent is phrased in the disjunctive and asserted that (continued…)

In terms of the second question accepted for review – whether the exculpatory clause is valid as to negligence – I also respectfully differ with the majority's conclusion that the clause is unenforceable as contrary to public policy relative to a claim based on gross negligence.[2]

> It is only when a given policy is so obviously for or against the public health, safety, morals or welfare that there is a virtual unanimity of opinion in regard to it, that a court may constitute itself the voice of the community in so declaring. There must be a positive, well-defined, universal public sentiment, deeply integrated in the customs and beliefs of the people and in their conviction of what is just and right and in the interests of the public weal.

*Shick v. Shirey*, 552 Pa. 590, 600, 716 A.2d 1231, 1235-36 (1998) (quoting *Mamlin v. Genoe*, 340 Pa. 320, 325, 17 A.2d 407, 409 (1941)); *see also Tayar v. Camelback Ski Corp.*, 616 Pa. 385, 399, 47 A.3d 1190, 1199 (2012) (recognizing that "avoidance of contract terms on public policy grounds requires a showing of overriding public policy

---

(…continued)
Plaintiffs were, in fact, treated by the team physician and hospital staff as the consent requires. *See* Memorandum of Law in Support of Defendants' Motion for Summary Judgment at 5, *reprinted in* R.R. 4197a.

[2] Appellants argue that the question is not before the Court. They contend the only issue relating to gross negligence is whether the waiver's language encompasses gross negligence. Appellants reason the Superior Court determined that the waiver would not violate public policy even if applied to claims based on gross negligence, *see Feleccia v. Lackawanna Coll.*, 156 A.3d 1200, 1212 (Pa. Super. 2017), and Plaintiffs did not file a protective cross-appeal from that ruling. *See* Brief for Appellants at 47. It should be noted, however, that "protective cross-appeals are disfavored and that 'a successful litigant need not file a protective cross-appeal on pain of waiver.'" *Meyer, Darragh, Buclker, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 635 Pa. 427, 448, 137 A.3d 1247, 1260 (2016) (Saylor, C.J., concurring) (quoting *Lebanon Valley Farmers Bank v. Commonwealth*, 623 Pa. 455, 464, 83 A.3d 107, 113 (2013)). Thus, I have little difficulty construing the question framed by Appellants, concerning whether the waiver is "valid" as to gross negligence, as subsuming the issue of whether its enforcement relative to a proven claim of gross negligence would violate public policy.

from legal precedents, governmental practice, or obvious ethical or moral standards"). *Tayar* cited *Williams v. GEICO Government Employees Insurance Co.*, 613 Pa. 113, 32 A.3d 1195 (2011), for this position, and continued as follows:

> Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest. As the term "public policy" is vague, there must be found definite indications in the law of the sovereignty to justify the invalidation of a contract as contrary to that policy[.] . . . Only dominant public policy would justify such action. In the absence of a plain indication of that policy through long governmental practice or statutory enactments, or of violations of obvious ethical or moral standards, the Court should not assume to declare contracts . . . contrary to public policy. The courts must be content to await legislative action.

*Tayar*, 616 Pa. at 399-400, 47 A.3d at 1199 (quoting *Williams*, 613 at 120-21, 32 A.3d at 1200) (alterations made by *Tayar*).

In this vein, it seems to me that, to invalidate the waiver relative to gross negligence claims as contrary to public policy, the concept of gross negligence would, at a minimum, have to be well understood and defined. Apart from a clear notion of what constitutes gross negligence as distinguished from ordinary negligence, it seems difficult to contend that laws, legal precedents, long governmental practice, or other recognized indicators of longstanding, dominant public policy are so firmly entrenched in this Commonwealth against such waivers as to permit this Court to declare, as the majority presently does, that they are judicially prohibited.

Yet, as the majority explains, it is difficult even to ascertain the precise meaning of gross negligence, as that term represents an "amorphous concept," that is, at its essence, "merely negligence with a vituperative epithet." The majority proceeds to describe gross negligence as "appear[ing] to lie somewhere between" negligence and recklessness. Majority Opinion, *slip op.* at 21 n.9, 27.

This type of uncertainty in discerning just what gross negligence consists of, in my view (and for reasons more fully explained below) undermines the concept that liability waivers should be deemed unenforceable as against claims of gross negligence although they can be valid and enforceable in relation to claims of ordinary negligence.

In terms of the competing interests involved, it should go without saying that athletic and other recreational pursuits by Pennsylvania residents are in the public interest and should be encouraged. *See, e.g.*, *Chepkevich v. Hidden Valley Resort, L.P.*, 607 Pa. 1, 30, 2 A.3d 1174, 1191 (2010) (reviewing cases). On the other hand, it is plainly contrary to public policy to enforce releases which would allow individuals intentionally to harm others with impunity. *Accord Tayar*, 616 Pa. at 401, 47 A.3d at 1200. In *Tayar*, this Court extended that understanding to harm stemming from recklessness, that is, conduct in which the actor knowingly disregards an unreasonable risk of harm. *Tayar* reasoned that the conscious act of ignoring such a risk "aligns . . . closely with intentional conduct." *Id.* at 403, 47 A.3d at 1201. Still, this Court should not overlook the competing policy grounds underlying the enforceability of liability waivers relative to inherently risky athletic activities.

Generally speaking, an exculpatory clause is a renunciation of a right and, as such, it constitutes a means of allocating risk as between contracting parties. *See generally* Anita Cava & Don Wiesner, *Rationalizing a Decade of Judicial Responses to Exculpatory Clauses*, 28 SANTA CLARA L. REV. 611, 648 (1988). Because incurring risks is costly, shifting risks from the organizer of the athletic endeavor (the "supplier") to the participant (the "consumer") allows the supplier to lower the price of the activity, particularly where there is market competition and/or where, as here, the provider is a non-profit organization. *Cf. Carnival Cruise Lines v. Shute*, 499 U.S. 585, 594, 111 S. Ct. 1522, 1527 (1991) (applying similar reasoning to a contractual forum-selection

clause).  *See generally* Brief for *Amicus* Ass'n of Indep. Colls. & Univs. of Pa. at 12-14 (detailing that complying with the generalized duty imposed by the Superior Court would be likely to impose significant costs on the Association's member institutions).  A lower price, in turn, serves the public interest because, on the margin at least, recreational opportunities become available to lower-income residents who would otherwise be excluded from such events.

It may be assumed that another factor favoring enforcement is the recognition that, subject to limiting principles, parties are generally at liberty to enter into contracts of their choosing.  *See Cent. Dauphin Sch. Dist. v. American Cas. Co.*, 493 Pa. 254, 258, 426 A.2d 94, 96 (1981).  This is reflected in the test for enforceability, one element of which asks whether each party is a "free bargaining agent."  *Tayar*, 616 Pa. at 399, 47 A.3d at 1199 (citing *Emp'rs Liab. Assur. Corp. v. Greenville Business Men's Ass'n*, 423 Pa. 288, 224 A.2d 620 (1966)).

Conversely, enforcing waivers of liability based on any kind of fault – including ordinary negligence – diminishes incentives for the supplier to manage risks which it is in a better position than the consumer to control.

None of the above is to suggest that negligent or grossly negligent conduct is in any sense socially beneficial.  Rather, it is offered solely for the purpose of illustrating that multiple competing interests are at stake when a litigant requests that we judicially invalidate an otherwise binding contractual provision on public policy grounds. Presumably, this Court's line of decisions enforcing waivers as to ordinary negligence reflects a balancing of these considerations.

Certainly, and as noted, a weighing of such policies favors unenforceability where intentional or reckless conduct is concerned.  In such instances, not only are there obvious reasons based on enduring societal mores which support such a result,

but – and perhaps less obvious – any competing interest in cost reduction is not unduly compromised. This is because, absent some proof of intentional conduct or conscious disregard, the common pleas court can, in a given case, be expected to act as a gatekeeper so that the supplier need not incur the cost of litigating the case to the conclusion of a jury trial and, perhaps, post-trial motions.

The same cannot be said for gross negligence precisely because of its "amorphous" nature. After today it will be difficult for common pleas courts to decide – when the defendant is in possession of a validly-executed waiver covering the activity in question – whether the complaint should be dismissed on the grounds that it only alleges ordinary negligence and not gross negligence. As a consequence, litigants can be expected to argue, with regard to any supportable allegation of negligence, that they are entitled to have a jury decide whether the defendant's negligence was, in fact, "gross." Absent thorough and detailed appellate guidance as to the types of facts that must be pled to allege gross negligence, such an argument is likely to prevail in many if not most cases.

In all events, the type of policy making this Court presently undertakes is best suited to the General Assembly. We have observed on multiple occasions that the legislative branch is the appropriate forum for the balancing of social policy considerations and interests and the making of social policy judgments, and that it has the tools to perform these tasks – tools which the courts lack. *See, e.g., Seebold v. Prison Health Servs., Inc.*, 618 Pa. 632, 653 & n.19, 57 A.3d 1232, 1245 & n.19 (2012).

Accordingly, I respectfully dissent from the holding reached in Part II(b) of the majority opinion. I note, however, that I do not foreclose reconsidering my position if, in the future, the concept of gross negligence in Pennsylvania is made subject to a more

precise definition which allows for some measure of consistency and predictability in litigation.