373 Pa. Superior Ct. 554 (1988)
542 A.2d 81
Elsie PERRY and Charles DiFerdinando as Parents and as Natural and Appointed Guardians of Joseph DiFerdinando an Incompetent
v.
MIDDLE ATLANTIC LUMBERMENS ASSOCIATION and State Mutual Life Assurance Company of America (Insurance & Pension Division).
Appeal of STATE MUTUAL LIFE ASSURANCE COMPANY OF AMERICA.
Supreme Court of Pennsylvania.
Argued January 22, 1988.
Filed April 12, 1988.
Reargument Denied June 9, 1988.
*556 George G. O'Brien, Philadelphia, for appellant.
Roger J. Harrington, Philadelphia, for appellees.
*557 Before CIRILLO, President Judge, and McEWEN and MONTEMURO, JJ.
MONTEMURO, Judge:
Appellant, State Mutual Insurance Company, appeals from an order granting summary judgment in favor of appellees, Elsie Perry and Charles DiFerdinando, acting as appointed guardians of Joseph DiFerdinando. We affirm, but base our decision on a rationale different from that adopted by the trial court.
This matter was heard as a case stated on a stipulation of facts. Joseph DiFerdinando was employed as a laborer by Hatboro Lumber and Fuel Company (Hatboro). Hatboro was a member of the Middle Atlantic Lumbermens Association Group Trust (MALA). Appellant, State Mutual Insurance Company, issued a group insurance policy to the trustees of MALA. Pursuant to this policy Joseph DiFerdinando, as an employee of Hatboro, became an insured on February 1, 1981. All of DiFerdinando's premiums were paid by Hatboro. On March 8, 1981, DiFerdinando was totally disabled as the result of an automobile accident. At that time he ceased active employment with Hatboro. Hatboro continued to pay premiums on the policy up to December 31, 1981, but on that date ceased paying premiums. DiFerdinando was never notified of his possible rights to convert his group policy to an individual policy. However, the parties agree that DiFerdinando's employment with Hatboro ended no later than December 31, 1981. Appellant paid medical benefits under the policy up to and including December 31, 1982, with the exception of $13,271.57, and has made no further payments.
Appellant and appellees filed cross motions for summary judgment on the stipulated facts. The trial court granted appellees' motion for summary judgment, finding that cessation of active service because of disability was excluded from the termination provisions of the policy. As a result, the court concluded that appellant was required to compensate DiFerdinando for medical expenses incurred over a *558 year after his employment had ended. The trial court also found that DiFerdinando had provided adequate proof of loss to satisfy the policy provision. This timely appeal followed.
Initially we note that our standard of review in cases awarding summary judgment is plenary. Thornburgh v. Lewis, 504 Pa. 206, 209, 470 A.2d 952, 954 (1983). Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Pa.R.C.P. 1035. In considering a motion for summary judgment, the trial court is bound to follow several firmly established principles. Specifically, the court must examine the entire record in the light most favorable to the nonmoving party. The court's sole function is to determine whether there is an issue of fact to be tried and not to decide issues of fact. Finally, the court must resolve all doubts as to the existence of a genuine issue of fact against the party moving for summary judgment. See Taylor v. Tukanowicz, 290 Pa.Super. 581, 586, 435 A.2d 181, 183 (1981); Schacter v. Albert, 212 Pa.Super. 58, 62, 239 A.2d 841, 843 (1968).
The first issue raised by appellant is whether DiFerdinando's insurance coverage terminated under the termination provision of the policy so that the extended loss provision of the policy was triggered, requiring appellant to compensate DiFerdinando only for those expenses incurred within one year from the date of termination of insurance. Resolution of this question rests upon the legal effect of certain language contained in the "Termination of Insurance" provision of the insurance policy. The relevant provisions are as follows:
TERMINATION OF INSURANCE. The insurance in force on the Employee automatically terminates on the first to occur of the termination events:
.....
(3) the termination of the Employee's employment. *559 Cessation of active service (other than for disability) in the class of employees eligible for insurance is deemed termination of employment except that if active service ceases because the employee is pensioned, retired, temporarily laid-off or granted leave of absence, his employment is deemed to continue if the premium for his insurance is paid until the end of the insurance month next following the insurance month in which he ceases active service.
Major Medical Insurance  Period of Extended Loss
Sickness or Injury. If as a result of sickness which commences or an accident which occurs while the insurance hereunder is in force, any covered person is totally disabled on the date of termination of insurance, a period of extended loss will be established for such sickness or injury provided benefits became payable during the period of total disability.
Any period of extended loss will terminate
(a) on the date of termination of total disability, or
(b) twelve months after termination of insurance.
(emphasis added).
The policy provides that insurance coverage "automatically terminates" upon "the termination of employment." Appellant argues that because the parties stipulated that DiFerdinando's employment ended no later than December 31, 1981, his insurance coverage terminated on that date and appellant was only required to compensate DiFerdinando for expenses incurred up until December 31, 1982 under the extended coverage provision of the "sickness and injury" clause.
Appellees counter by arguing that the termination provisions of the policy distinguish between "termination of employment" and "cessation of active service." They argue that the parenthetical language contained in the termination provision exempts cessation of active service caused by disability from being deemed termination of employment under the policy. As a result, appellees claim that DiFerdinando's insurance has not terminated, that the extended *560 loss provision was not triggered, and that appellant owes him $45,000, which is the amount of medical bills incurred after December 31, 1982.
Both appellees and the trial court read the termination and extended loss provisions to mean that DiFerdinando's insurance coverage continues indefinitely until his disability ceases, even though his employment has been terminated and premium payments have been discontinued. We disagree with this interpretation.
In Brown v. Carnegie-Illinois Steel Corp., 168 Pa.Super. 380, 77 A.2d 655, aff'd, 368 Pa. 166, 81 A.2d 562 (1951), we construed a termination provision much like the provisions presented in this case. The group policy provision in Brown provided:
The insurance of any employee shall automatically cease upon the occurrence of any of the following events: (a) the termination of this policy, (b) the cessation of premium payments on account of such employee's insurance hereunder, (c) the thirty first day following the termination of his employment in the classes of employees insured hereunder. Cessation of active work by an employee shall be deemed to constitute termination of his employment except that, an employee absent from work because of disability due to injury or sickness or on account of lay-off or leave of absence will, subject to the continuance of premium payments on account of such employee's insurance, be regarded as still in the employment of the employer during the period of such disability, lay-off or leave of absence until the effective date of the discontinuance of such employee's insurance as entered on the employer's records. . . . At the end of the respective periods mentioned above or upon the effective date of the discontinuance of the employee's insurance as entered on the employer's records, as provided above, the employee's insurance hereunder shall terminate automatically unless he shall have returned to active work.
With respect to the foregoing provision, a six-judge panel of this court stated:

*561 The contract provides that the insurance coverage is terminated 31 days after cessation of work by an employe, subject to certain exceptions which are entirely for his benefit. The policy is silent on the subject of permanent disability but does provide that an employe absent from work because of disability due to injury or sickness will still be regarded as an employe. We agree with appellee that the intent of that provision is to protect the employe in the case of temporary illness or injury but not to continue his status as an employe, when permanently disabled until death. The termination of that status on the books of the employer terminates the interest of the former employe in the group insurance.
Id., 168 Pa.Superior Ct. at 384, 77 A.2d at 657.
Just as in Brown, supra, we believe that the termination and sickness and injury provisions in this case convey an intent to continue the status of a person who ceases active service due to disability as an employee, until such time as the employer elects to sever permanently the employment relationship. See Annotation, Termination of Coverage under Group Policy with Regard to Termination of Employment, 68 A.L.R.2d 8, 72-73 (1959). While the provisions in the present policy are the product of extremely poor draftmanship and by no means as succinct as those contained in Brown, supra, we believe that the effect of these provisions is clear.[1] The primary purpose of a group insurance policy like the one in question is "to supply low cost insurance for protection of workmen while actually *562 employed." See Kelly v. Montour Railroad Company, 195 Pa.Super. 587, 592, 171 A.2d 632, 634 (1961) (emphasis added) (quoting Brown, supra). A careful reading of the language contained in the termination provision in question indicates that when an employee ceases active service due to disability, his status as an employee continues indefinitely unless and until the employer takes some affirmative step demonstrating that his employment has been terminated. See Jones v. Metropolitan Life Insurance Company, 156 Pa.Super. 156, 163, 39 A.2d 721, 725 (1944). Employees who cease active service for reasons other than disability will be treated as if they were terminated prior to the date of actual termination, with the exception of those who cease acti service as a result of pension, retirement, temporary lay-off or leave of absence. Those employees who cease active service for the foregoing reasons are deemed to continue as employees for coverage purposes if the premiums are paid until the end of the insurance month following the month in which they cease active service. However, employees who cease active service because of disability are entirely excluded from the clause's operation by virtue of the parenthetical language. Those who are incapable of actively serving due to disability will not be treated as if terminated prior to the date of actual termination. Instead, their employment status will continue unconditionally until the employer severs the employment relationship. The purpose of this arrangement is evident. There are many times when an employee will be temporarily disabled and granted a leave of absence without pay. Common sense dictates that in such a case "neither the insurance company, the employer, or the employee contemplate the cancellation or termination of the insurance only to be revived with all the attendant bookkeeping expense and trouble when the employee returns to his labor." Prudential Insurance Company of America v. Sweet, 253 Ky. 643, 646-647, 69 S.W.2d 748, 749-750 (1934). The parenthetical language, excluding active service due to disability from being deemed termination of employment, serves a dual purpose. On the one hand, it gives the employer time to evaluate the status *563 of an injured employee and determine whether the employee will eventually recover and return to work. At the same time, the disabled employee remains fully covered until the employer takes action evidencing an intent to finally terminate the employment relationship. Generally, the question of whether the employer has elected to finally terminate the employment relationship depends upon whether the employer's acts and the attendant circumstances demonstrate an intention to treat the interruption of the employee's work as temporary or permanent. See Equitable Life Assurance Society v. Larocco, 68 F.2d 451 (3d Cir. 1933). The employer's refusal to pay further premiums is a factor evidencing an intent to permanently terminate the employment relation. Hanaieff v. Equitable Life Insurance Society, 371 Pa. 560, 92 A.2d 202 (1952).
In the instant case, the stipulation of facts reveals that Hatboro ceased paying premiums for DiFerdinando's insurance on December 31, 1981. The parties also stipulated that DiFerdinando's employment terminated no later than December 31, 1981. Consequently, it is undisputed that the employment relationship between Hatboro and DiFerdinando was permanently severed no later than December 31, 1981.[2] The termination of DiFerdinando's employment "automatically" terminated his insurance coverage as of December 31, 1981. On the date his insurance terminated, it is undisputed that DiFerdinando was totally disabled. Because he was "totally disabled on the date of termination of insurance", his coverage was extended for an additional period even though he was no longer employed. Under the extended coverage clause, the period of extended coverage ends on the date the disability ends or twelve months after the termination of insurance, whichever occurs first. See Guardian Life Insurance Company v. Zerance, 505 Pa. 345, 479 A.2d 949 (1984) (construing a similar medical *564 insurance termination provision and extended loss provision to operate in this fashion). Here, the twelve month extended coverage expired on December 31, 1982.
Although the termination and extended loss provisions in question provided coverage only up until December 31, 1982, we nevertheless find that appellant is liable for expenses incurred after that date because of the lack of notice to DiFerdinando of the termination of his insurance coverage and his attendant statutory privilege to apply for a policy of individual insurance upon termination of his group coverage. Pennsylvania insurance law provides that an insured under a group policy of insurance shall be given the opportunity to convert his group policy to an individual policy upon application and payment of an initial premium within thirty-one (31) days after the date of termination of group coverage. 40 P.S. § 756.2(d)(1).[3] Upon application, subject to the exceptions contained in 40 P.S. § 756.2(d)(6), the group insurer is required to issue an individual policy without evidence of the insurability of the insured. 40 P.S. § 756.2(d)(2). In order that the insured may exercise his option to convert, the legislature imposed a notice provision requiring either the group policyholder, who is normally the employer, or the insurer, to provide written notice to the insured of the option to convert his group insurance policy to an individual policy upon the termination of group coverage. 40 P.S. § 756.2(d)(19). The legislative history behind the bill requiring a conversion privilege in certain group accident and sickness policies, and notification of termination of group coverage, reveals that it was designed to protect terminated employees from being unknowingly cancelled under a group policy and subjected to personal liability for substantial medical expenses. On the third consideration of the bill before the House of Representatives, the purpose of the bill was aptly summarized by Representative Taylor as follows:

*565 Mr. Speaker, this is probably one of the greatest reforms in the insurance business in the last half century in this state. It has been long overdue.
This bill is designed to make sure that the people who are covered under group hospitalization policies, when that group certificate is cancelled, that the individual certificate holders are notified. This is something that has been going on for too many years, too long. I would urge everyone to support this piece of legislation because it is long overdue and it really is a major reform in the insurance industry.
House Journal p. 4639 (May 12, 1976) (statement of Rep. Taylor).
The specific language of 40 P.S. § 756.2(d)(19), requiring written notice of the conversion privilege, provides as follows:
A notification of the conversion privilege shall be included in each certificate of coverage.
Each certificate holder in the insured group shall be given written notice of such conversion privilege and its duration within fifteen days before or after the date of termination of group coverage, provided that if such notice be given more than fifteen days but less than ninety days after the date of termination of group coverage, the time allowed for the exercise of such privilege of conversion shall be be extended for fifteen days after the giving of such notice. If such notice be not given within ninety days after the termination of group coverage, the time allowed for the exercise of such conversion privilege shall expire at the end of such ninety days. Written notice by the contract holder given to the certificate holder at his last known address, or written notice by the insurer mailed to the certificate holder at the last address furnished to the insurer by the contract holder, shall be deemed full compliance with the provisions of this clause for the giving of notice. A group contract issued by an insurer may contain a provision to the effect that notice of such conversion privilege and its duration shall be *566 given by the contract holder to each certificate holder upon termination of his group coverage.
40 P.S. § 756.2(d)(19). This provision unequivocally imposes a joint obligation on the insurer and the group policy holder to notify the insured of his conversion privilege. In the event that the insured is not provided with written notice of the termination of insurance or his option to convert to a policy of individual insurance within ninety (90) days from the termination of group coverage, the insurer remains liable under the group policy until such notice is provided to the insured. Additionally, when notice is sent more than ninety (90) days from termination of group coverage, the time for the exercise of the privilege provided in the policy is extended for ninety (90) days. See Harris v. St. Christopher's Hospital for Children, 291 Pa.Super. 451, 436 A.2d 203 (1981) (holding that coverage under a group life insurance policy was extended beyond the period provided in the policy because of failure to comply with the statutory notice of conversion privilege); see also Olkowski v. Prudential Insurance Company of America, 597 F.Supp. 1197 (E.D. Pa. 1984) (where insurer did not notify insured of policy's pending termination and conversion privilege, insurer remained liable for medical expenses). This interpretation effectuates the legislature's intent of protecting the insured, who runs the risk of incurring personal liability for substantial medical expenses in the event that he is not aware that his coverage has lapsed. See Poch v. Equitable Life Assurance Society of United States, 343 Pa. 119, 22 A.2d 590 (1941).
We recognize that one commentator urges that the consequences of failure to notify of termination of insurance coverage and the attendant conversion privilege is merely an extension of the time period within which to exercise the privilege. See Best, Notice by Insurers of Termination of Group Coverage in Pennsylvania, 90 Dick.L. Rev. 101 (1985) (citing cases). We believe, however, that this interpretation undermines the legislative intent behind the conversion privilege. Were we to construe the statutory *567 notice provision to merely extend the period for exercising the privilege, rather than coverage, in the event of non-compliance, there would be no incentive whatsoever for either the insurer or the group policyholder to notify the insured of his conversion option. Indeed, both the insurer and the employer could sit back on their heels until the expiration of the ninety (90) day period following the termination of group coverage and face no consequences for their inaction. It is an elementary principle of statutory construction that the legislature is presumed not to intend an absurd or unreasonable result. See 1 Pa.C.S.A. § 1921; Schaefer v. Hilton, 473 Pa. 237, 373 A.2d 1350 (1977). The legislative mandate that an insured be provided with an opportunity to convert his group policy to an individual policy presupposes that the insured be placed on notice of such an option. In order to ensure that he is aware of the conversion privilege, the legislature imposed a joint obligation on the insurer and the group policyholder to notify the insured of the termination of group coverage and the attendant conversion rights. Consequently, we hold that where an insured is not provided with notice of the termination of group coverage and possible conversion rights within ninety (90) days from the termination of group coverage, the insurer remains liable for medical expenses incurred up until the time such notice is given. When notice is given outside the ninety (90) day period, the insured is provided with an additional ninety (90) days within which to apply for a converted policy of individual insurance. The insurer may then seek contribution from the group policyholder for any liability incurred for the failure to provide notice.[4]
While the parties to this action have not briefed or argued the consequences of the lack of notice of termination of coverage and attendant conversion privileges, we believe *568 that our decision, in addition to effectuating the legislature's intent, is in accord with Pennsylvania Supreme Court precedent. Our supreme court has stressed the importance of providing notice of cancellation of group coverage, although not specifically addressing the statutory requirement of notice of the conversion privilege. In Guardian Life Insurance Company v. Zerance, supra, our supreme court was faced with the question of the propriety of the termination of medical insurance benefits under a group policy similar to the one at bar. In finding that benefits were properly terminated, the court noted that termination of coverage must be consistent with the terms of the policy and that the insured must be given notice of intended cancellation of the group coverage. Id. 505 Pa. at 350, 479 A.2d at 952, (citing Poch v. Equitable Life Assurance Society of United States, supra).
In Poch, the named beneficiary of a group policy instituted an action to recover unpaid total and permanent disability benefits which had allegedly accrued during the insured's lifetime. In finding that the insured remained covered because of the lack of notice of the termination of coverage, the court reasoned:
Upon review of the authorities, and upon reason as well, our conclusion is that, under a group policy like that now before us, the insured employee must be regarded as a party to the contract at least to the extent that the group policy cannot be cancelled or any of its effective provisions eliminated, by either the employer or insurer, except in a manner provided by the policy, without giving such employee notice of the intended cancellation or modification, so that he may timely exercise any conversion privilege which may be available to him under the terms of the policy, or, where such privilege is not given, in order that he may seasonably obtain similar insurance protection on his own account elsewhere; further that in the absence of such notice, an agreement of cancellation or modification like that entered into between *569 the Association and the Society is, as to such employee, legally ineffective to relieve the insurance company from liability under the original policy.
Poch, 343 Pa. at 128, 22 A.2d at 594 (emphasis added). Consequently, we believe that both the legislature and the Pennsylvania Supreme Court have expressed a clear dictate that in the event an insured under a group policy of major medical insurance is not notified of the termination of group coverage and the attendant conversion privileges, the insurer will remain liable under the original policy for expenses incurred.
The present record is devoid of evidence that DiFerdinando was notified that his group coverage under the extended benefits clause would terminate as of December 31, 1982. Moreover, the parties have stipulated that DiFerdinando was never notified of the possible privilege of converting to an individual policy of insurance upon the expiration of his group coverage. As a result, we believe that the trial court properly held appellant liable for medical expenses incurred by DiFerdinando after December 31, 1982.
Appellant also claims that it is not obligated to pay DiFerdinando $13,271.57 in medical expenses incurred prior to the termination of his insurance because of failure to comply with the "proof of loss" provision of the policy. This provision provides as follows:
PROOFS OF LOSS. Written proof of loss must be furnished to the Company, in the case of claim for loss for which the policy provides any periodic payment contingent upon continuing loss, within ninety days after the termination of the period for which the Company is liable, and in the case of claim for any other loss, within ninety days after the date of such loss. Failure to furnish such proof within the time required shall not invalidate nor reduce any claim if it was not reasonably possible to give proof within such time, provided such proof is furnished as soon as reasonably possible.
*570 Appellant claims that it was not presented with proof of loss of the $13,271.57 in medical expenses until June 17, 1986, and should therefore not be required to compensate appellee for these expenses. The trial court found that appellant received adequate notice of DiFerdinando's total and permanent disability. We agree with this finding.
Pennsylvania appellate courts have generally held that substantial compliance with such proof of loss provisions, rather than strict literal compliance, is all that is required. Fishel v. Yorktown Mutual Insurance Company, 254 Pa. Super. 136, 385 A.2d 562 (1978). In Albert v. Mutual Benefit Health and Accident Association, Omaha, 350 Pa. 268, 38 A.2d 321 (1944), our supreme court articulated the purpose behind a proof of loss provision:
`The purpose of a provision for notice and proofs of loss is to allow the insurer to form an intelligent estimate of its rights and liabilities, to afford it an opportunity for investigation, and to prevent fraud and imposition upon it.'
Id., 350 Pa. at 277, 38 A.2d at 324-325.
Moreover, where it appears that the insured has not substantially complied with the proof of loss provisions in the policy, the insurer is required to prove that it suffered prejudice as a consequence of the breach. See Brakeman v. Potomac Insurance Company, 472 Pa. 66, 371 A.2d 193 (1977). In Brakeman, the court explained the desirability of imposing a prejudice requirement on insurers as follows:
[a] reasonable notice clause is designed to protect the insurance company from being placed in a substantially less favorable position than it would have been if timely notice had been provided, e.g., being forced to pay a claim against which it has not had an opportunity to defend effectively. . . . Where the insurance company's interests have not been harmed by late notice . . . the reason behind the notice condition in the policy is lacking, and it follows neither logic nor fairness to relieve the insurance *571 company of its obligations under the policy in such a situation.
Id., 472 Pa. at 75, 371 A.2d 197 (citations omitted). Thus, the primary reason behind the Brakeman Prejudice requirement is to guard against forfeiture in the absence of good reason.[5]Id.
While appellant may not have received the actual medical bills for the $13,271.57 in expenses that DiFerdinando incurred until June 16, 1986, it did have notice that appellant was totally disabled by December 18, 1981. DiFerdinando was injured on March 7, 1981. On March 18, 1981, DiFerdinando's attorney sent notice of the incident to Hatboro, who acknowledged receipt of the notice on March 20, 1981.[6] In addition, appellees submitted a "Notice of Permanent and Total Disability" to appellant on December 18, 1981 and a "Statement of Claim" form on April 13, 1982. We believe that the efforts of appellees' reflect substantial compliance with the proof of loss provision in question. However, even if we were to find that they had not substantially complied with the provision, we would be constrained to conclude that appellant has failed to demonstrate the requisite prejudice necessary to absolve them from liability under the policy.
Accordingly, we find that the trial court properly granted summary judgment in favor of appellees.
Order affirmed.
NOTES
[1] We note that while the termination provision could be more carefully drafted, we do not believe that the provision is rendered ambiguous by the positioning of the parenthetical language, as appellant urges. In Metzger v. Clifford Realty Corp., 327 Pa.Super. 377, 386, 476 A.2d 1, 5 (1984), we stated:

A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends; and a contract is not rendered ambiguous by the mere fact that the parties do not agree upon proper construction.
Because we do not believe that the provision in question is patently ambiguous, we need not resort to the principle that ambiguous provisions are construed against the drafter of the policy.
[2] Implicit in the stipulation that his employment was terminated no later than December 31, 1981, is that DiFerdinando was aware that his employment had been permanently terminated as of that date. Compare Jones v. Metropolitan Life Insurance Company, supra (For purpose of termination proviso, until an employee is clearly informed that he is discharged, the employment relation is not terminated).
[3] The group policy in question contained such a provision.
[4] We note that Section 756.2(d)(19), provides a mechanism by which an insurer may protect itself against such liability. The group policy can be drafted in a manner which places the obligation to notify the individual certificate holders solely upon the group policyholder.
[5] Although Brakeman was decided in the context of automobile liability insurance, this court has extended the prejudice requirement to other types of insurance. See Judge v. Celina Mutual Insurance Company, 303 Pa.Super. 221, 449 A.2d 658 (1982) (Brakeman rule applies to fire insurance policy). Similarly, federal courts have consistently extended Brakeman to other contexts. See Insurance Company of America v. Compagnie Des Bauxites De Guinea, 794 F.2d 871 (3d Cir. 1986) (Brakeman extended to loss of production policy); see also Del Boring Tire Service v. Federal Emergency Management Agency, 496 F.Supp. 616 (W.D.Pa. 1980) (Brakeman rule applies to case involving flood insurance). We see no reason why Brakeman should not apply to a policy of major medical insurance.
[6] The stipulation does not reveal if Hatboro forwarded this notice to appellant. As a result we can not say when or if appellant received this notice.