476 A.2d 1

Helen METZGER, Esau Joseph, Samuel Levin, Harold Sherwin, Richard J. Makoul, Esquire, As Escrowee, Appellants,

v.

CLIFFORD REALTY CORP., A/K/A Communications Media, Inc., and Pentamation Enterprises, Inc.

Robert MARGOLIS, Harry Margolis, Vincent Abajian, and Zarnas Corporation, Appellants,

v.

PENTAMATION ENTERPRISES, INC.

Superior Court of Pennsylvania.

Argued Oct. 13, 1983.

Filed April 6, 1984.

Petition for Allowance of Appeal Denied Oct. 3, 1984.

Richard J. Makoul, Allentown, for appellants (No. 328). Michael Prokup, Allentown, for appellants (No. 329). J. Stephen Kreglow, Easton, for appellees.

Before SPAETH, President Judge, and MONTEMURO, and POPOVICH, JJ.

MONTEMURO, Judge:

This matter is before the Court on the consolidated appeals of two groups of shareholders of the now defunct corporation, TV Time and Channel, Inc. (hereinafter "TV Time, Inc."). The shareholders brought parallel actions against Pentamation Enterprises, Inc. (hereinafter "Pentamation") under an agreement of sale wherein Pentamation, through a wholly owned subsidiary, purchased the business, assets, and liabilities of TV Time, Inc. After a non-jury trial, the lower court entered a verdict in favor of Pentamation, exceptions by the shareholders were dismissed, and judgment was entered. The shareholders appeal on the basis that the lower court's interpretation of the agreement of sale was erroneous.

■ Our scope of review of a judgment entered after a trial before a judge without a jury is limited. We must accept findings of fact which are supported by the evidence, for the lower court is in a better position than we are to resolve conflicts in the evidence and issues of credibility. We are not bound, however, by findings not supported by the evidence; nor are we bound by the lower court's inferences from this evidence or its conclusions of law. *Frowen v. Blank*, 493 Pa. 137, 425 A.2d 412 (1981).

The factual background of this matter is not in dispute, the parties having stipulated to the significant events involved. TV Time, Inc. operated a business of publishing a weekly television program listing under the copyrighted trade name of TV Time and Channel. Pentamation, a data processing firm, supplied its services to TV Time, Inc. to produce label and listing information. During the year 1971, the financial condition of TV Time, Inc. was poor; it was losing money [1] and Pentamation was not paid $12,000.00 for its data processing services rendered over several months.

Joseph Cunningham, the president of TV Time, Inc. and editor of TV Time and Channel, proposed that Pentamation acquire the business and revamp the product by investing substantial data processing technique to gear the booklet to specific cable companies. On August 30, 1971, the president of Pentamation wrote a letter to Cunningham presenting Pentamation's proposal for acquisition of TV Time and Channel:

Dear Joe:

During the past several months we have mutually discussed the feasibility of Pentamation acquiring TV Time & Channel. After reviewing the data you have supplied to us, we propose to acquire TV Time & Channel and to utilize the resources available to us to implement the computerized text system for cable editions. Our proposal is based on the creation of a new wholly owned corporation responsible for the current TV Time & Channel operations and the new text systems. It is our intent to make all reasonable efforts to insure the success of this new venture, however, due to the inherent risks involved, *we make no guarantees and condition our offer so that final settlement for TV Time & Channel will require reasonable performance by the subsidiary*

---

1. The format of the TV Time and Channel booklet at that time made it directly competitive with the widespread publication, TV Guide, as well as weekly television supplements which were furnished by newspapers.

*company over the next three years.* The following points highlight our offer:

·1. Pentamation, through the subsidiary company, would purchase the assets of TV Time & Channel for up to 50,000 shares of Pentamation common stock. This stock would be payable from the subsidiary company contingent on continued operations over a three year period, 15% (7,500 shares) payable October 1, 1971, 35% (17,500 shares) payable October 1, 1972, and 50% (25,000 shares) payable October 1, 1973....

. . . .

... We look forward to your participation with Pentamation and to a long term mutually profitable relationship. (Emphasis added).

The shareholders of TV Time, Inc. subsequently voted to accept this proposal of Pentamation, and an agreement was executed on October 21, 1971.

The agreement provides, in pertinent part:

1. *Sale of Business.* The Seller [TV Time, Inc.] shall sell, transfer and deliver to the Purchaser [Cliffland Realty Corp. a/k/a Clifford Realty Corp. a/k/a Communications Media, Inc., which corporation is a wholly owned subsidiary of Pentamation] all the Seller's assets shown on the schedule of the Seller, dated September 30, 1971 attached hereto as Exhibit "1" together with the trade name, any and all copyrights, subscription lists, contracts, going value....

. . . .

3. *Purchase Price.* In consideration for such sale and transfer, the Purchaser shall transfer, at the closing:

(a) to the Seller, or its nominees, 7,500 shares of the no par value common stock of Pentamation, fully paid and nonassessable, said certificates to be in such denominations, amounts and names as may be requested by the Seller; and

(b) to the Merchants National Bank of Allentown, Allentown, Pennsylvania (hereinafter called "Escrowee"), 55,000 shares of the no par value common stock of

Pentamation, fully paid and non-assessable with appropriate stock powers attached.

4. *Payment of Escrow.*

(a)(1) The Escrowee shall transfer and deliver to the Seller, or its assigns, shares of Pentamation stock held by it as follows:

(A) September 30, 1972—17,500 shares

(B) September 30, 1973—25,000 shares

(2) The Escrowee shall transfer and deliver on September 30, 1974 to the individuals named in Exhibit "2" attached hereto and made a part hereof, the shares of Pentamation stock listed in said Exhibit; the total number of shares being delivered on said date to be 12,500 shares.

(b) Transfer of Pentamation stock by the Escrowee on each of the dates above mentioned is contingent upon:

(1) The Purchaser having not terminated the business acquired from the Seller before a transfer date. In the event such termination of business occurs, Escrowee shall return to the Purchaser any shares remaining in Escrow and neither Seller nor its assigns shall have any right to or interest in said shares.

. . . .

5. *Liquidation, Dissolution and Discontinuation of Business.*

(a) The Seller covenants that, promptly upon receipt by it at the closing, of the stock of Pentamation, and in any event on or before April 30, 1972, it will distribute all such shares to its stockholders in complete winding up and liquidation.... The Seller agrees to assign and transfer to its stockholders, the right to receive additional shares of Pentamation from the Escrowee pursuant to ... this Agreement.

(b) The Purchaser hereby specifically reserves the right to discontinue and terminate at any time the operation of the business which is the subject of this Agreement when, in its exclusive business judgment, its Board of Directors deems it desirable to do so. In the event of

said termination, the provisions of paragraph 4(b)(1) shall be rendered operative.

6. *Assumptions of Liabilities and Contracts.*

(A) In further consideration for such sale and transfer, Purchaser shall assume and discharge, and shall indemnify the Seller against, all debts, liabilities and obligations of the Seller as shown on Exhibit "3" dated September 30, 1971.

The major liability assumed by Pentamation's wholly owned subsidiary under the agreement was TV Time, Inc.'s unearned subscription liability listed at $98,396.63. The subscription liability represented the pre-payment by subscribers for prospective editions of TV Time and Channel.

Pentamation delivered the 7,500 shares of stock at closing and the escrowee delivered the first contingent payout of 17,500 shares on September 30, 1972. During this time, Pentamation had spent twelve months developing the programming to produce the specialized cable booklet. In addition, Pentamation had invested a substantial amount of capital in TV Time and Channel. As a result of publishing the booklet, the subsidiary lost money for the calendar years 1971 and 1972, and Pentamation became concerned about the contingent stock payout due on September 30, 1973.

On September 29, 1973, one day prior to the scheduled contingent stock payout, the wholly owned subsidiary of Pentamation sold the business of publishing TV Time and Channel to Carl R. Kehler. Kehler took over operation of the business immediately without alteration or interruption of the business. Pentamation then informed the escrowee that it had terminated its operation of the business and, under the agreement, the remaining shares of stock in escrow should be returned to Pentamation. No further shares were distributed to the shareholders of TV Time, Inc.

The sole issue presented is whether the sale of TV Time and Channel to Kehler constituted a "termination of the operation of the business" under the agreement of sale,

such that Pentamation's obligation to deliver the remaining stock held in escrow was extinguished. The lower court found that the agreement of sale was ambiguous and, referring to parol evidence, determined that it was the intent of the parties to make the scheduled payments conditional upon reasonable performance by the business. In this context, the condition of reasonable performance was not met, as the business incurred severe losses. Thus, the "salvage" sale merely to avoid further liability from the magazine's subscribers was encompassed within what the parties had intended as a "termination of operation" which would curtail Pentamation's duty to distribute the balance of the stock. Under this analysis, if the business *had* been successful, the condition of reasonable performance would have been met, and, therefore, a sale by Pentamation under such circumstances would *not* discharge Pentamation's obligation to distribute the remaining stock.

Appellants argue that the language of the contractual contingency is clear and unambiguous and so the lower court erred in referring to extrinsic evidence to discern the intent of the parties. We disagree.

In construing a contract, the intention of the parties is paramount and the court will adopt an interpretation which under all circumstances ascribes the most reasonable, probable, and natural conduct of the parties, bearing in mind the objects manifestly to be accomplished. *Unit Vending Corp. v. Lacas*, 410 Pa. 614, 190 A.2d 298 (1963). Where the words of the contract are clear and unambiguous, the intent of the parties must be determined exclusively from the agreement itself. *Kennedy v. Erkman*, 389 Pa. 651, 133 A.2d 550 (1957). Where the language of the written contract is ambiguous, extrinsic or parol evidence may be considered to determine the intent of the parties. *In re Herr's Estate*, 400 Pa. 90, 161 A.2d 32 (1960). While courts are responsible for deciding whether, as a matter of law, written contract terms are either clear or ambiguous; it is for the fact finder to resolve ambiguities and find the parties' intent. *Easton v. Washington County Insurance*

*Co.,* 391 Pa. 28, 137 A.2d 332 (1957); *Castellucci v. Columbia Gas of Pennsylvania, Inc.,* 226 Pa.Super. 288, 310 A.2d 331 (1973).

■ A contract will be found to be ambiguous:

[I]f, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning. A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends; and a contract is not rendered ambiguous by the mere fact that the parties do not agree upon the proper construction.

*Commonwealth State Highway and Bridge Authority v. E.J. Albrecht Co.,* 59 Pa.Commw.Ct. 246, 251, 430 A.2d 328, 330 (1981) (Quoting 8 P.L.E. CONTRACTS § 146 (1971)). Ambiguities may be either patent or latent. A patent ambiguity appears on the face of the instrument and arises from the defective, obscure, or insensible language used. *Steuart v. McChesney,* 498 Pa. 45, 444 A.2d 659 (1982). Latent ambiguities arise from extraneous or collateral facts which render the meaning of a written contract uncertain although the language, on its face, appears clear and unambiguous.[2] *Id.*

2. It is only in the case of latent ambiguity that the court is permitted to go *outside the writing* to make the *initial* determination of whether an ambiguity exists. *Kohn v. Kohn,* 242 Pa.Super. 435, 364 A.2d 350 (1976). This exception to the general rule against parol evidence is expectably limited. The usual instance wherein a latent ambiguity arises " 'is one in which a writing refers to a particular person or thing and is thus apparently clear on its face, but upon application to external objects is found to fit two or more of them equally' " *Steuart v. McChesney, supra,* 498 Pa. at 53, 444 A.2d at 663 (Quoting from *Easton v. Washington County Insurance Co., supra,* 391 Pa. at 35, 137 A.2d at 336). Examples of these usual instances of latent ambiguity have been found where an insurance policy covered a "hay house" and there were two "hay houses", *Lycoming Mutual Insurance Co. v. Sailer,* 67 Pa. 108 (1870); and where an insurance policy insured two chicken houses for different amounts and the policy did not designate which was chicken house No. 1 and which was chicken house No. 2, *Koplin v. Franklin Fire Insurance Co.,* 158 Pa.Super. 301, 44 A.2d 877

■ We find that a patent ambiguity appears on the face of the instrument. The contingency in question is contained in two sections of the agreement of sale. Paragraph 4(b) generally provides:

(b) Transfer of Pentamation stock by the Escrowee on each of the dates above mentioned is contingent upon:
(1) The Purchaser having not *terminated the business* acquired from the Seller before a transfer date. (Emphasis added).

The contingency is then explored in greater detail in paragraph 5(b):

(B) The Purchaser hereby specifically reserves the right to discontinue and *terminate* at any time *the operation of the business* which is the subject of this Agreement when, in the exclusive business judgment, its Board of Directors deems it desirable to do so. In the event of said termination, the provisions of paragraph 4(b)(1) shall be rendered operative. (Emphasis added).

Appellants point to the dictionary definition of "terminate" and its usage in paragraph 4(b) and conclude that the explicit and plain meaning of "terminate the business" is to put an end to the existence of the business. Therefore, since the business continued in existence under the operation of Kehler, it was not "terminated" and the condition relieving Pentamation of its stock payout obligation was not fulfilled.

(1945). Latent ambiguity has also been found where a duplicity of meaning results from reference to external *objective practices* as well as external *objects:* the term "alimony" in a separation agreement was held to be latently ambiguous where tax consequences were recognized as often prompting use of the term "alimony" in separation agreements while intending child support. *Kohn v. Kohn, supra.* Similarly, the Third Circuit case of *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001 (3rd Cir.1980), seems to squarely address this type of latent ambiguity based on external objective practices. While not couched in these terms, *Mellon Bank* holds that if a reasonable alternative interpretation is suggested, "external signs and objective indicia" may be considered in determining whether ambiguity exists. Thus, extrinsic evidence is properly considered to show that a "two by four" is never really two inches by four inches, but somewhat smaller, and that a "pound" of caviar is always fourteen ounces.

While we do not quarrel with appellants' definition of the word "terminate", their emphasis on exactly *what* was to be terminated under the contractual condition is misplaced. Paragraph 5(b) expands on the general language contained in paragraph 4(b), and specifies that the purchaser reserved the right to terminate the *operation* of the business. Paragraph 5(b) then details that the purchaser could exercise this right when it desired to do so in its exclusive business judgment. Specific provisions of an instrument will be regarded as qualifying the meaning of broad general terms. *In re Alloy Manufacturing Co. Employees Trust*, 411 Pa. 492, 192 A.2d 394 (1963). Paragraph 5(b) being more specific, it qualified the general language of paragraph 4(b). Thus, the contingency involved here is the purchaser's right to terminate the operation of the business, rather than to terminate the business itself.

■ The purchaser's right to terminate the operation of the business is obscure in meaning through indefiniteness of expression. *Commonwealth State Highway and Bridge Authority v. E.J. Albrecht Co., supra.* In determining whether a written contract contains such an ambiguity, the court may consider " 'whether alternative or more precise language, if used, would have put the matter beyond reasonable question.' " *Celley v. Mutual Benefit Health and Accident Association*, 229 Pa.Super. 475, 482, 324 A.2d 430, 434 (1974) (Quoting *Mazzilli v. Accident and Casualty Insurance Co. of Winterhur, Switzerland*, 35 N.J. 1, 7, 170 A.2d 800, 803 (1961)); *see also Commonwealth, Department of Transportation v. Bracken Construction Co.,* 72 Pa.Commw.Ct. 620, 457 A.2d 995 (1983). In *Celley,* this court held that the term "eye trouble" in a contract of insurance was ambiguous since it could have referred to diseases or disorders of the eye arising from pathological conditions, or damage to the eye resulting from accident or other external physical injury, or both. Similarly, the purchaser's right to "terminate the operation of the business" can refer to either liquidation of the business by the purchaser, or sale of the business by the purchaser, or both.

More precise language denoting either liquidation or sale or both would have put this matter beyond reasonable question. In the absence thereof, however, the meaning of that language is ambiguous.

Reference to the remaining provisions of the contract does not resolve the meaning of this particular language, but instead confirms its ambiguity. In paragraph 5(a), provision is made for the "complete winding up and liquidation" of the seller, TV Time, Inc. In view of the use of the term "liquidation" in paragraph 5(a), if the parties had intended that "termination of the operation of the business" in paragraph 5(b) could only mean liquidation of the business by the purchaser, it would seem that they would have employed this exact term. The parties, however, selected language which was broader than the recognized term of "liquidation."

■■■■ Thus, an ambiguity exists on the face of the instrument, and the lower court properly considered extrinsic evidence in determining the intent of the parties. This resolution being a fact finding function, *Easton v. Washington County Insurance Co., supra; Castellucci v. Columbia Gas of Pennsylvania, Inc., supra;* we cannot disturb the finding of intent if it is supported by the evidence. The letter of offer dated August 30, 1971, from the president of Pentamation to Cunningham, amply supports the fact finder's determination of intent, that intent being that the stock payouts were to be contingent upon reasonable performance of the business. With this understanding as the basis for the condition, it follows that a sale of the business under circumstances of poor performance would release Pentamation from further stock payout obligations, while a sale under circumstances of reasonable performance would not.[3] It is not contested that TV Time and Channel's

3. Appellants argue that under this analysis, Pentamation could have hypothetically sold the business for a large profit even though it had performed poorly, and still be relieved of additional stock payouts. This conjectured outcome is erroneous. If Pentamation had realized a large profit from the sale of the business, then the overall perform-

performance under Pentamation's subsidiary was poor, and so the salvage sale prior to September 30, 1973, operated to extinguish Pentamation's remaining contractual duties.

Accordingly, the judgments are affirmed.

ance of the business would have been boosted to the "reasonable performance" category, and distribution of stock would be required.