564 A.2d 937

DONEGAL MUTUAL INSURANCE COMPANY, Appellant,

v.

Lynn E. LONG, Individually and as Administratrix of the Estate of Lloyd E. Long, Deceased, and S. Kenneth Hertz and Lisa Hertz, his wife, and Cathleen C. Opel, Administratrix of the Estate of Joseph E. Hirst, Deceased, and Genway Corporation, Jones Pontiac Company, Jones Leasing Company, J & J Electronics, Amos Myers, Elsie Myers, Bullfrog Inn, Inc., and the Pennsylvania Insurance Guaranty Association.

Appeal of DONEGAL MUTUAL INSURANCE COMPANY.

DONEGAL MUTUAL INSURANCE COMPANY,

v.

Lynn E. LONG, Individually and as Administratrix of the Estate of Lloyd E. Long, Deceased, and S. Kenneth Hertz and Lisa Hertz, his wife, and Cathleen C. Opel, Administratrix of the Estate of Joseph E. Hirst, Deceased, and Genway Corporation, Jones Pontiac Company, Jones Leasing Company, J & J Electronics, Amos Myers, Elsie Myers, Bullfrog Inn, Inc., and the Pennsylvania Insurance Guaranty Association. (Two Cases)

Appeal of GENWAY CORPORATION, Jones Pontiac Company, and Jones Leasing Company.

Appeal of the PENNSYLVANIA INSURANCE GUARANTY ASSOCIATION.

Superior Court of Pennsylvania.

Argued Feb. 28, 1989.

Filed Sept. 21, 1989.

576

Peter J. Speaker, Harrisburg, for Donegal, appellant in No. 2147 and appellee in Nos. 2306 and 2348.

Maria Zulick, Verona, for Genway Corp., appellant in No. 2306 and appellee in Nos. 2147 and 2348.

Hugh M. Emory, Paoli, for The Pennsylvania Ins. Co., appellant in No. 2348 and appellee in Nos. 2147 and 2306.

Joseph Roda, Lancaster, for Long, appellee in Nos. 2147, 2306 and 2348.

Before DEL SOLE, MELINSON and HOFFMAN, JJ.

MELINSON, Judge:

Before us are three appeals arising from a declaratory judgment action commenced in the Court of Common Pleas of Lancaster County by the appellant in No. 2147 Philadelphia 1988, Donegal Mutual Insurance Company ("Donegal"). After all pleadings were filed, Donegal and defendants, Pennsylvania Insurance Guaranty Association ("PIGA") and, collectively, Genway Corporation, Jones Pontiac Company, and Jones Leasing Company ("Genway–Jones"), filed respective motions for summary judgment. Following oral argument, the trial court granted in part and denied in part the motions of Donegal and Genway–Jones and denied the motion of PIGA. It is from the trial court's order of July 11, 1988 disposing of these summary judgment motions that the instant appeals arise.

Donegal filed the declaratory judgment action to determine the obligations of the various parties and their insurers to provide insurance coverage or indemnification in connection with a motor vehicle accident. The accident resulted in the deaths of Lloyd E. Long and Joseph E. Hirst and serious personal injury to S. Kenneth Hertz, and is the subject of the civil action, *Long v. Opel*, No. 3340–1955, in the Court of Common Pleas of Lancaster County. In addition to Genway–Jones and PIGA, Donegal named as defendants to the declaratory judgment action, Lynn E.

Long, individually and as Administratrix of the Estate of Lloyd E. Long, deceased; S. Kenneth Hertz and Lisa Hertz, his wife; Cathleen C. Opel, Administratrix of the Estate of Joseph E. Hirst, deceased; J & J Electronics; Amos Myers; Elsie Myers, and the Bullfrog Inn, Inc.

The relevant facts are as follows. Joseph E. Hirst, deceased ("Hirst"), was one of two partners in a business known as J & J Electronics. Donegal issued an automobile insurance policy to the partnership and its partners effective November 8, 1984 to November 9, 1985. One clause of this policy provides in part: "For any covered auto [not owned by the insureds], the insurance provided by this policy is excess over any other collectible insurance."

On August 27, 1985, Hirst rented a car from appellee, Jones Leasing Company, pursuant to a written rental agreement. The car was owned by co-appellee, Genway Corporation, who in turn had purchased it from co-appellee, Jones Pontiac Company. Genway Corporation leased the car to Jones Leasing Company. The rental agreement provided in relevant part as follows:

1. In no event shall the vehicle be used, operated or driven ... (e) by any person in violation of the motor vehicle code of the state in which such vehicle is then located, or (f) by any person while under the influence of alcohol or drugs....

* * * * * *

4. Lessor provides liability coverage for Customer ... in accordance with the standard provisions of a Basic Automobile Liability Insurance Policy for bodily injury and property damage ($1,000,000 combined single limit for each occurrence) arising from the use of the Vehicle as permitted by this Rental Agreement. Customer being an insured under said policy agrees to comply with and be bound by all the terms, conditions and restrictions thereof which are hereby incorporated by reference herein and made a part of this Rental Agreement.... Said policy does not apply to any liability of Customer or the driver, or of the employer of either[,] with respect to bodily

injury, sickness, disease or death or damage to property caused directly or indirectly as the result of violation of this Rental Agreement. In the event that coverage is imposed, by operation of law, to the benefit of any person other than the Customer or any Authorized Operator described herein, then the limits of such coverage shall be the minimum requirements of the Financial Responsibility Law or other applicable statute of the state or other jurisdiction in which the accident occurred.

The Midland Insurance Company issued an automobile insurance policy to Genway Corporation with limits to One Million Dollars ($1,000,000) effective November 1, 1984 to November 1, 1985. An endorsement to this policy identified the named insured, in relevant part, as follows:

a. Genway Corporation, its licensees and any subsidiary companies as may now exist or as may hereafter be constituted.

b. Any lessees of such Company or Corporation but only to the extent that terms of any lease obligates Genway or its subsidiaries or licensees to provide such lessee such insurance as is afforded by the policy.

On August 31, 1985, four days after Hirst entered the rental agreement with Jones Leasing Company, the accident occurred which claimed the lives of Hirst and Mr. Long and which caused the injuries to Mr. Hertz. In the complaint filed in *Long v. Opel,* the plaintiffs, the Long estate and Mr. and Mrs. Hertz, allege that Hirst caused the accident and the resulting injuries while driving under the influence of alcohol.

By the time of the commencement of *Long v. Opel* and the filing of Donegal's declaratory judgment action, Midland Insurance Company had been declared insolvent by the Supreme Court of the State of New York. PIGA was therefore required to step in to back the Midland policy with Genway Corporation pursuant to the Pennsylvania Insurance Guaranty Association Act, 40 Pa.Stat.Ann. Section 1701.101 *et seq.* At issue, then, are the respective obli-

gations of Donegal, Genway–Jones,[1] and PIGA to provide coverage or indemnification to the Hirst Estate in the underlying civil action. With the basic facts not in dispute, Donegal, Genway–Jones, and PIGA filed motions for summary judgment.

Genway–Jones and PIGA deny that they owe coverage or indemnification to the Hirst Estate on the grounds that the liability of the Hirst Estate in *Long v. Opel* was caused by Hirst's operation of the rented vehicle while under the influence of alcohol in violation of the rental agreement. Donegal contends, however, that the clause in the rental agreement excluding insurance coverage when the vehicle is operated while under the influence of alcohol or drugs is void as against public policy, violative of the Motor Vehicle Financial Responsibility Law (75 Pa.Con.Stat.Ann. Section 1701 *et seq.*), and unconscionable. Donegal therefore argues that Genway–Jones is liable to provide up to One Million Dollars ($1,000,000) in coverage to the Hirst Estate in accordance with the rental agreement notwithstanding the exclusion clause. Donegal contends that Genway–Jones and PIGA are the primary insurers and Donegal the secondary insurer of the Hirst Estate in *Long v. Opel*, and Genway–Jones and PIGA contend that Donegal is the sole insurer against the liability of the estate. Genway–Jones also contends that even if the exclusion clause is stricken, it had satisfied its obligation to provide insurance coverage under the rental agreement by purchasing the Midland policy, and therefore the Hirst Estate has no further claim against it. PIGA concurs with this argument, and further asserts that if PIGA is found liable to the Hirst Estate because the exclusion clause is invalid and because Genway–Jones continues to be liable under the rental agree-

1. We note that the terms of any relevant agreements and policies shall determine which of the three parties we designate as Genway–Jones will have liability, if any, under such agreements and policies. As these parties have unified themselves in a common cause, addressing issues jointly with the implication that any potential liability is common to all of them, we shall not differentiate among them for purposes of this appeal and, like the trial court, shall refer to them jointly with a common designator.

ment, PIGA is responsible only to provide the minimum financial requirements mandated by the Financial Responsibility Law. Even then, PIGA argues, Donegal is the primary insurer.

The trial court, after consideration of the parties' motions for summary judgment, held in pertinent part as follows:

that part of the rental agreement between Joseph E. Hirst, deceased, on one part and Defendants, Genway Corporation, Jones Pontiac Company, and Jones Leasing Company, on the other part, that purports to exclude the obligation of those Defendants to provide one million dollars ($1,000,000) in liability insurance coverage, if liability is caused directly or indirectly by operation of the vehicle while under the influence of alcohol or drugs, is against public policy and void;

that the Defendant, the Pennsylvania Insurance Guaranty Association, has the primary duty to indemnify the Estate of Joseph Hirst for the first three hundred thousand dollars ($300,000) in damages for which the Estate of Joseph E. Hirst may be held liable in the civil action [of *Long v. Opel*], less the initial one hundred dollars ($100) in damages [2];

that the Plaintiff, Donegal Mutual Insurance Company, has the status of an excess insurer and it is obligated to indemnify the Estate of Joseph E. Hirst, pursuant to the Donegal policy, only after the Defendant, the Pennsylvania Insurance Guaranty Association, has first paid two hundred ninety-nine thousand nine hundred dollars ($299,900) in satisfaction of the claims asserted against the Estate of Joseph Hirst in the civil action [of *Long v. Opel*]; and

that the Defendants, Genway Corporation, Jones Pontiac Company and Jones Leasing Company, are not obligated, pursuant to their rental agreement with Joseph E.

**2.** Pursuant to 40 Pa.Stat.Ann. Section 1701.201(b)(1)(i), the obligation of PIGA under the Pennsylvania Insurance Guaranty Association Act "shall include only that amount of each covered claim which is in excess of one hundred dollars ($100), and is less than three hundred thousand dollars ($300,000)."

Hirst, deceased, to indemnify the Estate of Joseph E. Hirst; but, rather, their obligation pursuant to said rental agreement was to obtain a liability insurance policy covering Joseph E. Hirst, in accordance with the standard provisions of a Basic Automobile Liability Insurance Policy for bodily injury and property damage (with a $1,000,000, combined single limit for each occurrence) arising from use of the rented vehicle; and said Defendants satisfied that obligation by the purchase of the liability insurance policy from Midland Insurance Company, except that those Defendants may be liable to the Pennsylvania Insurance Guaranty Association for the amount of any applicable deductible under the Midland policy.

Donegal appeals from that portion of the order finding that Genway–Jones had satisfied its obligation to provide insurance coverage under the rental agreement by purchasing the Midland policy, arguing that the rental agreement requires Genway–Jones to be the primary provider of coverage to the Hirst Estate of up to One Million Dollars ($1,000,000) with contribution by PIGA as mandated by statute. Genway–Jones and PIGA appeal from that portion of the order voiding the clause excluding coverage for liability arising from the operation of the vehicle while under the influence of alcohol or drugs. These parties also argue that if this clause is found to be void, the rental agreement requires only that coverage for liability shall be the minimum coverage required by the Motor Vehicle Responsibility Law. Finally, Genway–Jones and PIGA argue that Donegal bears primary coverage for the claims asserted against the Hirst Estate in *Long v. Opel*.

■ The first issue before us concerns the validity of the provision in the rental agreement which denies insurance coverage for liability arising from the operation of the vehicle while under the influence of alcohol or drugs in violation of the agreement. Specifically, we must determine the validity of this provision at the time of the accident, for some months after the accident the legislature enacted a section of the Motor Vehicle Financial Responsi-

bility Law which invalidates in insurance policies all such provisions. Section 1724 of the Act, effective July 1, 1986, provides:

(a) *General rule.* Insurance benefits may not be denied solely because the driver of the insured motor vehicle is determined to be under the influence of drugs or intoxicating beverages at the time of the accident for which benefits are sought.

(b) *Contract exclusions.* Provisions of an insurance policy which exclude insurance benefits if the insured causes a vehicular accident while under the influence of drugs or intoxicating beverages at the time of the accident are void.

The legislative history of this provision establishes that Section 1724 was enacted primarily to prohibit rental car agencies from excluding in their rental agreements coverage for liability arising from the intoxication of the driver—in essence, the very clause at issue on this appeal. Vol. III, Senate Journal, No. 77, p. 1421 (1985).[3]

We may not, of course, invalidate the exclusion in the Genway–Jones rental agreement pursuant to Section 1724. To do so would grant retroactive effect to this section. No statute may be retroactively applied "unless clearly and manifestly intended" for such application by the legislature. *Krenzelak v. Krenzelak,* 503 Pa. 373, 380, 469 A.2d 987, 990 (1983). *See also Rudolph Rosa, Inc. v. Latrobe Brewing*

---

**3.** The legislative history includes the remarks of the provision's author:

> Senator MELLOW: Mr. President, very simply stating the reason for the amendment, currently if you would negotiate to rent a car from one of our car rental agencies throughout the country and you sign an agreement to purchase insurance while you have that car rented, and sometime during the course of that rental ... if the individual driving the car is involved in a motor vehicle accident while the person was driving under the influence, there is an exclusion in the insurance contract that person has signed which does not give them coverage for that accident.... The reason for my offering the amendment is to take care of that exclusion in the contract.... It is really to try to close a loophole of someone who may have been in an accident for drunken driving.

Vol. III, Senate Journal, No. 77, p. 1421 (1985) (remarks by Sen. Mellow).

*Company,* 347 Pa.Super. 551, 500 A.2d 1194 (1985), *appeal denied* October 2, 1986. This does not prohibit us, however, from considering the trial court's ruling and Donegal's argument that the exclusion clause was invalid at the time of the accident on the grounds that it violated public policy.

" 'A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or if the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms.' " *Central Dauphin School District v. American Casualty Company,* 493 Pa. 254, 258, 426 A.2d 94, 96 (1981) (quoting Restatement (Second) of Contracts, Section 320(1) (now Restatement (Second) of Contracts 2d, Section 178(1))). At the time of the accident, no legislative act made the exclusion clause unenforceable. Therefore, we must determine whether the interest in enforcing this clause is clearly outweighed in the circumstances by a public policy then in effect against the enforcement of the clause.

While the courts of this Commonwealth have not been loathe to strike a provision in a contract as being violative of public policy or to uphold a contractual provision when that provision did not disturb public policy, our courts have rarely articulated a definition of "public policy." *See, e.g., Central Dauphin School District,* 493 Pa. 254, 426 A.2d 94; *Contractor Industries v. Zerr,* 241 Pa.Super. 92, 359 A.2d 803 (1976). No doubt, this is likely because of the difficulty, if not impossibility, of the task. "From a legal standpoint, the meaning of the phrase 'public policy' is vague and variable, and there is no fixed rule or definition applicable to all cases." 17 Am.Jur.2d, Contracts § 175, p. 533. A series of definitions, gleaned from case decisions and legal texts, appears in Ballentine's Law Dictionary, Third Edition (1969) (with citations omitted):

... The policy of promoting the public welfare and opposing that which is at war with society and in conflict with the moral principles of the period. The protection and promotion of public welfare, including public health and

morality. That principle of law which holds that no subject or citizen can lawfully do that which has a tendency to be injurious to the public or against the public good....

We do not represent that these definitions are comprehensive or exclusive. We deem them relevant, however, to our discussion.

We note the irony that one constant of public policy is that public policy is never constant. "It must ever be borne in mind that times change, and that with them public policy must likewise change. A decision or a rule that is believed to be in accord with the general welfare today may not accord with it tomorrow." 6A Corbin on Contracts, § 1375, p. 12. *See also Henningsen v. Bloomfield Motors, Inc.*, 32 N.J. 358, 161 A.2d 69 (1960). The passage of Section 1724 of the Motor Vehicle Financial Responsibility Law in 1986 is not therefore dispositive of the issue of whether the exclusion clauses of the kind at issue violated the public policy of this Commonwealth in 1985 when the rental agreement was signed and the accident occurred. We must attempt to discern whether such clauses violated public policy at that relevant time.

The sources of public policy are many. 6A Corbin on Contracts, § 1375. Chief among these are constitutions and statutes, which are "declarations of public policy by bodies of men [and women] authorized to legislate." *Id.* Section 179 of the Restatement (Second) of Contracts 2d provides guidance:

A public policy against the enforcement of promises or other terms may be derived by the court from

(a) legislation relevant to such a policy, or

(b) the need to protect some aspect of the public welfare, as is the case for the judicial policies against, for example,

(i) restraint of trade

(ii) impairment of family relations, and

(iii) interference with other protected interests.

The parties direct us to two sources which they contend articulate the public policy of the time relevant to the issue before us. Donegal cites the Motor Vehicle Financial Responsibility Law (prior to the addition of Section 1724), while Genway–Jones and PIGA cite certain case law. We are persuaded that the public policy of this Commonwealth, as articulated by the Motor Vehicle Financial Responsibility Law as it existed in 1985, prohibited the implementation of the exclusion clause set forth in the Genway–Jones rental agreement.

We find that public policy expressed in *Mowery v. Prudential Property & Casualty Ins. Co.*, 369 Pa.Super. 494, 502, 535 A.2d 658, 663 (1988), *appeal denied* 518 Pa. 641, 542 A.2d 1370 (1988): "The purpose of the Motor Vehicle Responsibility Law is to require owners of registered vehicles to be financially responsible." [4] The clause in the rental agreement which excludes coverage for liability arising from the operation of the vehicle while under the influence of drugs or alcohol is inimical to this purpose. If the clause were permitted to stand, the owners of rental vehicles would have an avenue to avoid their financial

4. Although our court articulated this in 1988, after the passage and inclusion of Section 1724 in the Motor Vehicle Financial Responsibility Law, the Law as it stood in August, 1985 fully reflected the same purpose. *See* Subchapter H, Proof of Financial Responsibility, Sections 1781 to 1787 of the Motor Vehicle Financial Responsibility Law. Section 1724 only augmented the core of the act; it did not alter its purpose.

*See also* Couch on Insurance 2d (Rev. ed.) § 45:733, which, by construing financial responsibility laws of other jurisdictions, provides an analysis relevant to our discussion and supportive of our holding:

A financial responsibility act is remedial in nature and is therefore to be liberally construed to carry out the declared public policy and achieve the legislative objective. Otherwise stated, liability insurance policies executed, filed, and approved pursuant to the provisions of such statutes will be liberally construed so as to attain the legislative intent to protect the general public from loss by injury or death caused by the *negligence* of the insured, his agent, his servant, or his independent contractor.

*Conversely, the purpose of the financial responsibility acts of protecting injured claimants is not to be defeated by imposing restrictions on the claimant not called for by the statute.*
Emphasis added; citations omitted.

responsibility to the victims of accidents whenever the driver of the leased vehicle was intoxicated or sometimes when he was negligent.[5] Victims of accidents with rental vehicles might therefore find themselves without recourse to compensation for their injuries, or perhaps only to the extent of their own uninsured motorist coverage, absent the fortuity that the driver of the rental vehicle is covered by other insurance or possesses sufficient assets for compensation. The public policy enunciated by the Motor Vehicle Financial Responsibility Law, pursuant to its 1985 provisions, is to foster financial responsibility for damages caused to individuals on the roadways, not to promote uninsurance.

We find support in other jurisdictions for our holding. In *Allstate Ins. Co. v. Sullivan*, 643 S.W.2d 21 (Mo.App.1982), the Missouri Court of Appeals considered a near identical exclusion clause in a rental agreement in light of that state's Motor Vehicle Safety Responsibility Law. The lessor/driver was denied coverage when he became involved in an accident while under the influence of alcohol in violation of the rental agreement. While the trial court found that the lessor had violated the rental agreement, the trial court also found that the rental agency's attempt to exclude coverage for this violation was contrary to the public policy of Missouri. In affirming, the Missouri Court of Appeals stated:

> While it may be readily conceded that automobile liability insurance policies are contracts, it must also be recognized that they carry public considerations reaching beyond simply the rights of the parties to the contract. It is the public policy of this state to assure financial remuneration for damages sustained through the negligent operation of motor vehicles on the public highways of this state not only by the owners of such automobiles but also by all persons using such vehicles with the owner's permission, express or implied. The manifestation of this

5. We note that the rental agreement would also deny coverage when liability arose from the driver's violation of the motor vehicle code of any state where the driver operates the vehicle.

public policy is found in the Motor Vehicle Safety Responsibility Law....

643 S.W.2d at 22–23 (citations omitted). The court stated further:

In determining the extent of coverage here we must be aware of the serious consequences of allowing restrictions in the rental agreement to determine the coverage to be provided. The liability protection for which the lessee has paid could be reduced to a nullity by rental provisions prohibiting operation of the car "negligently" or contrary to any statute or ordinance.... It cannot be disputed that car rental has become commonplace and a lucrative business. The insurer is well aware that the insurance provided is, unlike personal liability policies, designed primarily to protect lessees of the named insured, not the named insured itself. The insurer is also aware that the cost of such insurance is being assumed, at least indirectly, by the lessee. It is not unreasonable, therefore, that such policies should be viewed as providing coverage closely equivalent to that provided the "named insured" in personal liability policies, rather than the more restrictive coverage provided by personal policies to the named insured's permittee, who normally has made no contribution to the premium on the policy.

*Id.* at 23–24.

The Vehicle and Traffic Law of New York has also been construed as enunciating a public policy to ensure compensation for victims of traffic accidents which cannot be defeated by restrictive clauses in rental agreements. In *Tom Sawyer Country Day School v. Providence Washington Insurance Co.,* 108 A.D.2d 810, 485 N.Y.S.2d 126 (1985), *appeal denied* 65 N.Y.2d 608, 484 N.E.2d 671, 494 N.Y.S.2d 1028 (1985), the New York Supreme Court, Appellate Division, reviewed a rental agreement which prohibited the operation of the vehicle by all persons under the age of twenty-one and over the age of sixty. An insurance policy was issued covering "anyone" who used the vehicle with the owner's permission. A nineteen-year-old employee of

the lessee became involved in an accident while driving the leased vehicle. The court reasoned as follows:

We agree with the trial court that the attempted disclaimer of defendant Providence is invalid and that it is obligated to defend plaintiff and its employee. Providence is not relieved of its obligation under the insurance policy to defend plaintiff because of the latter's alleged violations of the lease by employing Honig, who was then under 21 years of age and without a chauffeur's license, as the driver of the van. Due to public policy considerations insurers of automobile rental companies should not be permitted to avail themselves of a lessee's violation of a rental agreement for the the purpose of escaping the duty to indemnify persons covered by the policy for liability for injuries to innocent third parties [reference to Vehicle and Traffic Law]. While the plaintiff has a separate liability insurance policy with its carrier ..., our determination is based on reasoned principles.

485 N.Y.S.2d at 127–128 (citations omitted).

In *Motor Vehicle Accident Indemnification Corporation v. Continental National American Group Company*, 35 N.Y.2d 260, 319 N.E.2d 182, 360 N.Y.S.2d 859 (1974), the Court of Appeals of New York construed a rental agreement which prohibited the use of the leased vehicle by any persons except those named in the agreement without the permission of the rental agency.

The restrictions sought to be imposed by Continental violate the public policy of this State. A slight deviation from such a restrictive lease could render an injured victim devoid of adequate protection, which is contrary to the intent envisaged by section 388 of the Vehicle and Traffic Law. The lessor (and Continental), because of the public policy question involved, knew or should have known that the probabilities of the car coming into the hands of another person were exceedingly great and in these circumstances they are to be charged with constructive consent, which satisfies the requirements of section 388 of the Vehicle and Traffic Law.... As this court has

said, "[Section 388 of the Vehicle and Traffic Law] expresses the policy that one injured by the negligent operation of a motor vehicle should have recourse to a financially responsible defendant." New York courts, recognizing the policy expressed in this section, have looked unfavorably upon similar rental agreements. We note that the courts of other jurisdictions have stressed the strong public policy for such financial responsibility statutes and the rationale of our holding.

35 N.Y.2d at 264, 319 N.E.2d at 184–185, 360 N.Y.S.2d at 862 (citations omitted).[6]

In 1985, panels of this court construed two insurance policies which included clauses which restricted coverage for liability arising from the intoxication of the insured. In neither case were these clauses declared invalid. Genway–Jones and PIGA cite these cases as the true enunciation of the public policy in this Commonwealth prior to the passage of Section 1724 of the Motor Vehicle Financial Responsibility Law, one which recognized and gave effect to such clauses.

In *United States Fidelity & Guaranty v. Griggs*, 341 Pa.Super. 286, 491 A.2d 267 (1985), the court was asked to determine whether a liquor liability exclusion clause in an insurance policy issued to a restaurant and cocktail lounge was "so clearly worded and conspicuously displayed as to render the exclusion unambiguous as a matter of law." 341 Pa.Super. at 289, 491 A.2d at 268. The court analyzed the construction of the contract to conclude that the exclusion was clear and unambiguous, noting further that such clauses were standard in tavern general liability policies.

In *Parker v. Washington National Insurance Company*, 348 Pa.Super. 341, 502 A.2d 239 (1985), the court was

---

6. *See also P & H Vehicle Rental and Leasing Corporation v. Garner*, 416 So.2d 503 (Fla.App. 5 Dist., July 7, 1982) and *Weekes v. Atlantic National Ins. Co.*, 370 F.2d 264 (9th Cir.1966), where intoxication exclusion clauses in rental agreements similar to the clause in the present case were struck down as contrary to the public policy stated in Florida and Arizona financial responsibility legislation, respectively. Particular provisions in that legislation, however, distinguish these cases from the one before us.

asked to construe whether the word "injury" in the insurance policy included by definition "death." The deceased in this case was the holder of a travel accident policy issued in connection with the deceased's membership in a certain "Club" referred to in the policy. The policy excluded coverage for "injury incurred due to the Insured being under the influence of any intoxicant or narcotic." 348 Pa.Super. at 344, 502 A.2d at 240. The court found that "injury" unambiguously included "death."

We note that in neither case were the exclusion clauses challenged on the grounds that they violated public policy. Further, even if such challenges were raised, we would not find the court's rulings on those matters dispositive. The public policy considerations which we must heed in this appeal are grounded in the Motor Vehicle Financial Responsibility Law governing the financial responsibility of owners of motor vehicles. *Griggs* involved liability policies for tavern owners, while *Parker* involved a travel accident policy. The public policy considerations for those matters, while perhaps related, are clearly distinguishable from the very basic consideration raised by the issue before us: that owners of licensed vehicles in this Commonwealth must maintain a financial responsibility so that victims of motor vehicle accidents will have recourse. That responsibility cannot be curtailed by a clause in a rental agreement denying coverage when liability arises when the driver is under the influence of alcohol or drugs. The public policy of this Commonwealth on this matter, as clear in 1985 as it is today, most definitely outweighs the enforcement of the exclusion clause.[7] Accordingly, we affirm the trial court on this issue.[8]

---

**7.** In coming to this balance, we take note not only of the mandate of the Motor Vehicle Financial Responsibility Law, but also the fact that the exclusion clause in the rental agreement takes away what was previously promised (and presumably purchased) by the rental agreement: liability coverage.

**8.** In light of our disposition, we do not address Donegal's alternative arguments on this issue.

■ Having found that coverage may not be denied under the exclusion clause of the rental agreement, we must now address those issues raised by the parties concerning what coverage is due and who is responsible for providing this coverage.

Genway–Jones and PIGA contend that the trial court's ruling that the rental agreement requires coverage in the amount of One Million Dollars ($1,000,000) is in error. Although the insurance clause of the rental agreement initially provides for liability coverage of One Million Dollars ($1,000,000), Genway–Jones and PIGA argue that with the exclusion clause stricken as invalid the final sentence of the agreement's insurance provision governs. This sentence reads:

> In the event that coverage is imposed, by operation of law, to the benefit of any person other than the Customer or any Authorized Operator described herein, then the limits of such coverage shall be the minimum requirements of the Financial Responsibility Law or other applicable statute of the state or other jurisdiction in which the accident occurred.

Genway–Jones and PIGA contend that since coverage is imposed by operation of law, as a result of our ruling on the validity of the exclusion clause, then only the minimum coverage requirements apply under the Motor Vehicle Financial Responsibility Law. These minimum limits, defining the "financial responsibility" required of owners of motor vehicles, are Fifteen Thousand Dollars ($15,000) for injury to any one person in any one accident, Thirty Thousand Dollars ($30,000) for injury to two or more persons in any one accident, and Five Thousand Dollars ($5,000) for damage to property of others in any one accident. 75 Pa.Con.Stat.Ann. Section 1702. We disagree with this argument, and affirm the trial court's holding that the rental agreement requires that coverage for Hirst's liability be in the contracted-for amount.

The language of the clause we feel is quite clear. The minimum coverage requirements of the Motor Vehicle Fi-

nancial Responsibility Law will apply whenever *coverage* is imposed by operation of law to *any person other than the "Customer" or other "Authorized Operator."* The parties do not dispute that Hirst was the "Customer." Therefore, this clause does not apply to the situation before us. *See Rusiski v. Pribonic,* 511 Pa. 383, 515 A.2d 507 (1986) (The intent of the parties to a contract is to be determined solely from the express language contained therein). It appears evident that the intent of this clause is to ensure that if a person not contemplated by the parties is provided coverage by operation of law, then coverage will be restricted to the minimum requirements under law, rather than the higher limits agreed upon by the parties.[9]

■ Further, even though we invalidated the exclusion clause on the grounds that it violated the public policy requiring owners of motor vehicles to maintain financial responsibility, we deem that the agreed-upon coverage of One Million Dollars ($1,000,000) remains in effect. "Financial responsibility" under the Motor Vehicle Financial Responsibility Law denotes the aforesaid minimum requirements. 75 Pa.Con.Stat.Ann. Section 1702. Our holding with respect to the exclusion clause does not alter the basic agreement of the parties, that liability coverage is to be provided in the agreed-upon amount. Indeed, our holding facilitates the implementation of that agreement, prohibiting Genway–Jones from taking away what it has agreed to provide in exchange for Hirst's rental. We find the language of *Allstate Ins. Co. v. Sullivan,* 643 S.W.2d 21, applicable:

> ... we also reject Allstate's contention that if the policy provides coverage the amount of coverage should be limited to the amount prescribed by the Safety Responsibility Law. Allstate contracted for a prescribed amount

---

**9.** In further support of this interpretation of the clause, we note the first sentence of paragraph 4, which reads, in pertinent part with emphasis supplied: *"Lessor provides liability coverage for Customer and any authorized and qualified operators described herein and no others* in accordance with the standard provisions of a Basic Automobile Liability Insurance Policy ... ($1,000,000 combined single limit for each occurrence)...."

of insurance. Our holding is that Allstate may not limit the person's operation covered by that policy more than allowed by Missouri public policy. Deciding that the extent of coverage must be determined by the public policy of Missouri does not change the contracted-for amount of that coverage.

643 S.W.2d at 23, n. 3.

■ We must now review Donegal's challenge to the trial court's finding that although the rental agreement provides for One Million Dollars ($1,000,000) in coverage, Genway–Jones satisfied its obligation to provide said coverage by obtaining insurance for that amount with Midland Insurance Company. Midland, it must be remembered, became insolvent following the accident.

The resolution of this issue is determined by the interpretation of paragraph 4 of the rental agreement. We quote the relevant portions once more:

Lessor provides liability coverage for Customer and any authorized and qualified operators described herein and no others in accordance with the standard provisions of a Basic Automobile Liability Insurance Policy for bodily injury and property damage ($1,000,000 combined single limit for each occurrence) arising from the use of the Vehicle as permitted by this Rental Agreement. Customer being an insured under said policy agrees to comply with and be bound by all the terms, conditions and restrictions thereof which are hereby incorporated by reference herein and made a part of this Rental Agreement. Customer or the driver of the vehicle shall immediately report any accident to Lessor and deliver to Lessor or its insurer every process, pleading, notice or paper of any kind relating to any claim, suit or proceeding received by Customer or said driver in connection with any accident or event involving the vehicle. Said policy does not apply to any liability of Customer ... with respect to bodily injury ... or damage to property caused directly or indirectly as the result of violation of this Rental Agreement.

The ambiguities of this paragraph are evident. On the one hand, it states that the lessor "provides coverage" for the lessee; while on the other, it makes reference to "a Basic Automobile Liability Insurance Policy ... the terms, conditions and restrictions thereof ... are hereby incorporated by reference." What the paragraph does not clearly state is that the lessor agrees to obtain and maintain a liability insurance policy in the agreed-upon amount only. In such a case, we would have little difficulty affirming the trial court, for Genway–Jones did indeed obtain a liability policy which was still in force at the time of the accident.

A court's duty when construing a contract is to determine the intent of the parties to the contract. *Lower Frederick Township v. Clemmer*, 518 Pa. 313, 543 A.2d 502 (1988); *Walton v. Philadelphia National Bank*, 376 Pa.Super. 329, 545 A.2d 1383 (1988). The court must look to the express language of the contract to ascertain this intent. *Rusiski*, 511 Pa. 383, 515 A.2d 507; *Steuart v. McChesney*, 498 Pa. 45, 444 A.2d 659 (1982). " 'In determining what the parties intended by their contract, the law must look to what they clearly expressed. Courts in interpreting a contract do not assume that its language was chosen carelessly.' " *Steuart*, 498 Pa. at 51, 444 A.2d at 662 (quoting *Moore v. Stevens Coal Co.*, 315 Pa. 564, 568, 173 A. 661, 662 (1934)). If the language to the written contract is ambiguous, however, extrinsic or parol evidence may be considered to determine the parties' intent. *Z & L Lumber Company of Atlasburg v. Nordquist*, 348 Pa.Super. 580, 502 A.2d 697 (1985); *Metzger v. Clifford Realty Corp.*, 327 Pa.Super. 377, 476 A.2d 1 (1984). *See also Burns Manufacturing Company, Inc. v. Boehm*, 467 Pa. 307, 313, n. 3, 356 A.2d 763, 766, n. 3 (1976); *United Refining Company v. Jenkins*, 410 Pa. 126, 189 A.2d 574 (1963).

"A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Walton*, 376 Pa.Super. at 341, 545 A.2d at 1389. *See also Hutchison v. Sunbeam Coal Corp.*, 513 Pa. 192, 519 A.2d 385 (1986). The provision of the

rental agreement regarding insurance coverage is ambiguous because two different constructions are discernable on its face: the separate constructions offered by Donegal and Genway–Jones. Donegal contends that the agreement provides that Genway–Jones is responsible for "providing" coverage in the amount of One Million Dollars ($1,000,000), while Genway–Jones contends that the agreement merely provides for the purchase of an insurance policy in the amount of One Million Dollars ($1,000,000).[10] It is appropriate, therefore, for a court to examine the surrounding circumstances concerning the formation and execution of the agreement in an effort to ascertain the intent of the parties. *United Refining Company,* 410 Pa. 126, 189 A.2d 574; *Walton,* 376 Pa.Super. 329, 545 A.2d 1383. In so doing, the court may consider the situation of the parties, the objects the parties had in mind, the nature of the subject matter of the agreement, the purpose of the agreement, and other relevant surrounding circumstances. *United Refining Company,* 410 Pa. at 138, 189 A.2d at 580; 8 P.L.E. Contracts § 144. *See also Lower Frederick Township,* 518 Pa. 313, 543 A.2d 502 (In ascertaining the intent of the parties, it is proper to consider the surrounding circumstances of the transaction and to also consider the purpose of the agreement).

The lower court in this instance "found" that Genway–Jones satisfied the requirements of the coverage clause in the rental agreement by purchasing the Midland policy. There is no evidence in the record or any indication in the briefs of the parties, however, that the lower court made this determination following a hearing on the surrounding circumstances of the transaction. This suggests that the court arrived at its holding based solely upon an interpretation of the language of the agreement. This is error. *See,*

---

**10.** A contract is not ambiguous, however, merely because the parties do not agree upon its construction. *Z & L Lumber of Atlasburg,* 348 Pa.Super. 580, 502 A.2d 697; *Metzger,* 327 Pa.Super. 377, 476 A.2d 1. We find, rather, that this provision of the rental agreement is ambiguous as a matter of law because it is susceptible of two different constructions advanced by the parties to the agreement. *See Walton,* 376 Pa.Super. 329, 545 A.2d 1383.

*e.g., Burns Manufacturing Co.,* 467 Pa. at 313, n. 3, 356 A.2d at 766, n. 3.[11] We are constrained, therefore, to remand this matter to the trial court so that the court may hear evidence, if any, of the relevant matters regarding the transaction as it relates to the coverage clause of the rental agreement.

In so holding, we take note that this issue came before the lower court on cross-motions for summary judgment. Summary judgment may be entered when the pleadings, depositions, answers to interrogatories, admissions on file, and supporting affidavits reveal no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Pa.R.C.P. 1035(b); *Dume v. Elkcom Co.,* 368 Pa.Super. 280, 533 A.2d 1063 (1987). Donegal and Genway–Jones each filed for summary judgment on this issue. It is clear, however, that the ambiguity in the language of the rental agreement presents a genuine issue of material fact, namely, the intention of the parties concerning insurance coverage. Summary judgment is therefore inappropriate. Accordingly, we reverse the trial court's holding that Genway–Jones satisfied its obligation under the coverage clause of the rental agreement by purchasing the Midland policy and remand this matter to the trial court to entertain evidence regarding the intent of the parties concerning the coverage clause.[12]

**11.** In *Burns Manufacturing Co.,* the court, in *dicta,* stated:
> The chancellor made no apparent attempt to construe the language of the addendum clause in light of the circumstances which surrounded its execution. Instead he appears to have relied on the apparent imprecision of the language as a sufficient basis to rule against the appellant.... This, in our view, is not a satisfactory approach to the construction of ... facially ambiguous language....

467 Pa. at 313, n. 3, 356 A.2d at 766, n. 3.

**12.** We also note that as a matter of law, Genway–Jones is not entitled to summary judgment on the face of the language of the coverage clause. When there is an ambiguity in the language to a contract, the uncertain language is to be construed most strongly against the drafter. *Rusiski,* 511 Pa. 383, 515 A.2d 507; *Village Beer and Beverage, Inc. v. Vernon D. Cox and Co., Inc.,* 327 Pa.Super. 99, 475 A.2d 117 (1984). *See also Unit Vending Corp. v. Lacas,* 410 Pa. 614, 190 A.2d 298 (1963) ("It is fundamental that where the language of a written

■ The next issue before us, as would follow from our holdings thus far, is where the parties stand in priority of responsibility for the satisfaction of the liabilities of the Hirst Estate arising from the accident.

Hirst's policy with Donegal provides that Donegal shall provide insurance for automobiles not owned by the insured in "excess over any other collectible insurance." The liability coverage of Genway–Jones is collectible insurance by the plain meaning of these documents. Therefore, as between Genway–Jones and Donegal, Genway–Jones has the primary responsibility to the liabilities of the Hirst Estate arising from the accident while Donegal has a secondary responsibility. Whether Genway–Jones satisfied its responsibility by the purchase of the Midland policy is the issue to be determined by the trial court in accordance with our previous discussion.

■ What then are PIGA's responsibilities and rights? The Pennsylvania Insurance Guaranty Association Act (hereinafter the "Act") provides that PIGA, among its other powers and duties, shall:

(i) Be obligated to make payment to the extent of covered claims of an insolvent insurer existing prior to the determination of said insurer's insolvency ... but such obligation shall include only that amount of each covered claim which is in excess of one hundred dollars ($100), and is less than three hundred thousand dollars ($300,000)....

document is ambiguous or its meaning doubtful, that in determining the intention of the parties, the writing must be construed most strongly against the party drafting it[,] and the interpretation which makes a rational and probable agreement must be preferred." 410 Pa. at 617, 190 A.2d at 300). It is not disputed that Genway–Jones was the drafter of the rental agreement. Further, we note that the Pennsylvania Supreme Court has "indicated" that the proper focus regarding issues of coverage under insurance contracts is the reasonable expectations of the insureds. *State Automobile Insurance Association v. Anderson,* 365 Pa.Super. 85, 528 A.2d 1374 (1987) (construing *Collister v. Nationwide Life Insurance Co.,* 479 Pa. 579, 388 A.2d 1346 (1978)). It is appropriate, however, for the trial court to consider the surrounding circumstances of the transaction prior to the application of these principles to the language of the ambiguous clause. *See Burns Manufacturing Co.,* 467 Pa. 307, 313, n. 3, 356 A.2d 763, 766, n. 3.

(ii) Be deemed the insurer to the extent of its obligation on the covered claims and to such extent have all rights, duties, and obligations of the solvent insurer as if that insurer had not become insolvent.

40 Pa.Stat.Ann. Section 1701.201(b)(1). A "covered claim," referred to in the foregoing, is defined under the Act as "an unpaid claim ... which arises under a property and casualty insurance policy of an insolvent insurer...." 40 Pa.Stat. Ann. Section 1701.103(5)(a).

PIGA acknowledges its responsibilities under the Act to "handle" claims filed against Midland because of Midland's insolvency. *See* PIGA's brief, p. 9. PIGA argues, however, that its responsibility is not immediate. Rather, PIGA contends that other available insurance must be exhausted in satisfaction of those claims before it is required to provide coverage. Section 1701.503 of the Act, entitled "Non-duplication of recovery," provides in pertinent part as follows:

(a) Any person having a claim against an insurer under any provision in an insurance policy other than a policy of an insolvent insurer which is also a covered claim, shall first be required to exhaust his right under such policy. Any amount payable on a covered claim under this act shall be reduced by the amount of any recovery under such insurance policy.

*See also Henninger v. Riley,* 317 Pa.Super. 570, 464 A.2d 469 (1983).

PIGA's primary argument is that the Hirst Estate, under Section 1701.503(a), is required to collect under the Donegal policy before PIGA's responsibility to provide payments arises. It is evident from the plain meaning of the Donegal policy, however, that Donegal is not required to provide benefits until other available insurance has been collected. The rental agreement provides for such other insurance, and the Midland policy was purchased to supply this insurance. It remains, however, a material issue of fact whether the insolvency of Midland requires Genway–Jones to provide coverage under the rental agreement or whether such

coverage will be represented solely by the Midland policy. In either event, PIGA will be required to provide payments under the Act prior to collection under the Donegal policy.

If the trial court on remand determines that Genway–Jones satisfied its coverage obligations under the rental agreement pursuant to the intention of the parties by the purchase of the Midland policy, quite clearly PIGA is responsible to provide payments under the Act before the Donegal policy comes into effect. As provided in the Act, PIGA has "all the rights, duties and obligations of the insolvent insurer as if that insurer had not become insolvent." 40 Pa.Stat.Ann. 1701.201(b)(1)(ii). The Donegal policy provides that its coverage is "excess over any other collectible insurance." Midland, had it remained solvent, would have provided such other collectible insurance. Pursuant to Section 1701.201(b)(1)(ii) of the Act, PIGA steps into the shoes of Midland. While Section 1701.503(a) provides that PIGA will stand in the place of the insolvent only when the claimant has exhausted his rights under other policies, the plain language of the Donegal policy demonstrates that the claimants in this case have no claim against Donegal until they can exhaust their claims against Midland.

Similarly, if the trial court determines that Genway–Jones is required to provide coverage of up to One Million Dollars ($1,000,000) under the rental agreement, despite its purchase of the Midland policy, PIGA would also be required under the Act to provide payments. Its responsibility to step into the shoes of Midland still exists even though Genway–Jones is found liable to provide coverage in the full policy amount.

The purposes of the Act mandate that PIGA provide coverage as required under the Act for the claims that could have been made against Midland. Section 1701.102(1) of the Act provides that the Act is designed, among other things, "to avoid financial loss to claimants or policyholders as a result of the insolvency of an insurer." *See also Bullock v. Pariser*, 311 Pa.Super. 487, 457 A.2d 1287 (1983).

Genway–Jones, as a holder of a policy of an insolvent insurer, is a party protected under the Act. The non-duplication provisions cannot be applied to Genway–Jones to strip it of its statutory protection. Although Genway–Jones may be required to provide liability coverage under the rental agreement, if the trial court so determines, PIGA may not implement the provisions of Section 1701.503(a) to forego its responsibility to provide coverage under the Act until Genway–Jones, and thereafter Donegal, have met their contractual responsibilities. Such a result is contrary to the general purpose of the Act and the particular purpose of Section 1701.503. We quote *Bullock,* 311 Pa.Super. at 494, 457 A.2d at 1290–1291:

> The non-duplication of recovery provision of § 503 of the Act functions to prevent windfall judgments ... [where] ... a claimant might obtain a much greater recovery than he would have received had the tortfeasor's insurance company remained solvent. Such a double recovery would exceed the loss-prevention purposes of the Act.

To achieve the loss-prevention purposes of the Act, PIGA is required, pursuant to and in accordance with the relevant portions of the Act, to satisfy claims made against Midland under Midland's policy with Genway–Jones. To avoid a duplication of benefits, PIGA's responsibility is inclusive of any claim against Genway–Jones under the rental agreement. Had Midland remained solvent, a claimant would have been able to receive no more than One Million Dollars ($1,000,000) under Midland's policy, the amount to be provided under the rental agreement and also designated in the policy. Therefore, a claimant may not receive more than that amount from Genway–Jones and PIGA combined.[13]

PIGA also argues that pursuant to Section 1701.503 its obligations do not arise until the injured claimants in the

13. We note that the Midland policy carried a Two Hundred Fifty Thousand Dollar ($250,000) deductible. This amount was to be deducted from any claim against the policy and made the responsibility of the insured, Genway–Jones. The trial court held that Genway–Jones is required to reimburse PIGA "for any unused portion of its $250,000 deductible under the Midland policy." This holding was not appealed and thus is not before us.

underlying civil action have exhausted their uninsured motorist benefits under their own automobile insurance policies, citing *Henninger v. Riley*, 317 Pa.Super. 570, 464 A.2d 469 (1983). Although PIGA raised this argument in its Motion for Summary Judgment and in its brief in support thereof, the trial court did not rule upon this issue. While PIGA's argument appears to be correct as a general proposition (*see also Bethea v. Forbes*, 519 Pa. 422, 548 A.2d 1215 (1988)), we feel that the issue should be remanded so that the trial court may determine whether summary judgment is warranted under the relevant facts provided they are not in dispute. Accordingly, we remand this issue to the trial court for its consideration and disposition.[14]

For the reasons stated above, we affirm in part and reverse in part the trial court's order of July 11, 1988. Specifically, we affirm the trial court's invalidation of the intoxication exclusion clause in the rental agreement; we affirm the trial court's determination that the rental agreement provides liability coverage in the amount of One Million Dollars ($1,000,000); we reverse the trial court's holding that Genway–Jones had satisfied its obligation under the rental agreement by purchasing the Midland Insurance Company policy, and we remand this issue so that the trial court may have an opportunity to determine the parties' intent with respect to the coverage clause after examining the circumstances surrounding the formation and execution of the agreement; we affirm the trial court's determination that PIGA is responsible to provide up to Two Hundred Ninety–Nine Thousand Nine Hundred Dollars ($299,900) pursuant to the Act (less contributions for the deductible as directed by the trial court), and we affirm the trial court's determination that Donegal shall be an excess insurer consistent with our discussion herein. Further, we remand to the trial court to determine the issue raised by PIGA regarding the responsibility of the injured claimants

14. Moreover, we reject PIGA's argument that until the relevant uninsured motorist benefits have been exhausted, Donegal drops to the status of primary insurer. We find no logic to this argument.

to exhaust their uninsured motorist benefits. Jurisdiction relinquished.